STUMP ET AL. *v.* SPARKMAN ET VIR

No. 76–1750.   Argued January 10, 1978—Decided March 28, 1978

350

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, REHNQUIST, and STEVENS, JJ., joined. STEWART, J., filed a dissenting opinion, in which MARSHALL and POWELL, JJ., joined, *post*, p. 364. POWELL, J., filed a dissenting opinion, *post*, p. 369. BRENNAN, J., took no part in the consideration or decision of the case.

George E. Fruechtenicht argued the cause and filed briefs for petitioners.

Richard H. Finley argued the cause for respondents. With him on the brief was Eugene Gressman.*

---

*Briefs of *amici curiae* urging affirmance were filed by *Robert L. Burgdorf, Jr.,* for the American Coalition of Citizens with Disabilities et al.; by *Bruce J. Ennis, Joel M. Gora, Paul Friedman,* and *Lawrence M.*

MR. JUSTICE WHITE delivered the opinion of the Court.

This case requires us to consider the scope of a judge's immunity from damages liability when sued under 42 U. S. C. § 1983.

I

The relevant facts underlying respondents' suit are not in dispute. On July 9, 1971, Ora Spitler McFarlin, the mother of respondent Linda Kay Spitler Sparkman, presented to Judge Harold D. Stump of the Circuit Court of DeKalb County, Ind., a document captioned "Petition To Have Tubal Ligation Performed On Minor and Indemnity Agreement." The document had been drafted by her attorney, a petitioner here. In this petition Mrs. McFarlin stated under oath that her daughter was 15 years of age and was "somewhat retarded," although she attended public school and had been promoted each year with her class. The petition further stated that Linda had been associating with "older youth or young men" and had stayed out overnight with them on several occasions. As a result of this behavior and Linda's mental capabilities, it was stated that it would be in the daughter's best interest if she underwent a tubal ligation in order "to prevent unfortunate circumstances . . . ." In the same document Mrs. McFarlin also undertook to indemnify and hold harmless Dr. John Hines, who was to perform the operation, and the DeKalb Memorial Hospital, where the operation was to take place, against all causes of action that might arise as a result of the performance of the tubal ligation.[1]

---

*Reuben* for the American Civil Liberties Union et al.; and by *Ronald M. Soskin* for the National Center for Law and the Handicapped, Inc.

[1] The full text of the petition presented to Judge Stump read as follows:

"STATE OF INDIANA \} ss:
COUNTY OF DEKALB

"PETITION TO HAVE TUBAL LIGATION PERFORMED ON MINOR AND INDEMNITY AGREEMENT

"Ora Spitler McFarlin, being duly sworn upon her oath states that she

352

The petition was approved by Judge Stump on the same day. He affixed his signature as "Judge, DeKalb Circuit Court," to the statement that he did "hereby approve the

is the natural mother of and has custody of her daughter, Linda Spitler, age fifteen (15) being born January 24, 1956 and said daughter resides with her at 108 Iwo Street, Auburn, DeKalb County, Indiana.

"Affiant states that her daughter's mentality is such that she is considered to be somewhat retarded although she is attending or has attended the public schools in DeKalb Central School System and has been passed along with other children in her age level even though she does not have what is considered normal mental capabilities and intelligence. Further, that said affiant has had problems in the home of said child as a result of said daughter leaving the home on several occasions to associate with older youth or young men and as a matter of fact having stayed overnight with said youth or men and about which incidents said affiant did not become aware of until after such incidents occurred. As a result of this behavior and the mental capabilities of said daughter, affiant believes that it is to the best interest of said child that a Tubal Ligation be performed on said minor daughter to prevent unfortunate circumstances to occur and since it is impossible for the affiant as mother of said minor child to maintain and control a continuous observation of the activities of said daughter each and every day.

"Said affiant does hereby in consideration of the Court of the DeKalb Circuit Court approving the Tubal Ligation being performed upon her minor daughter does hereby [sic] covenant and agree to indemnify and keep indemnified and hold Dr. John Hines, Auburn, Indiana, who·said affiant is requesting perform said operation and the DeKalb Memorial Hospital, Auburn, Indiana, whereas [sic] said operation will be performed, harmless from and against all or any matters or causes of action that could or might arise as a result of the performing of said Tubal Ligation.

"IN WITNESS WHEREOF, said affiant, Ora Spitler McFarlin, has hereunto subscribed her name this 9th day of July, 1971.

"/s/ ORA SPITLER MCFARLIN
Ora Spitler McFarlin
*Petitioner*

"Subscribed and sworn to before me this 9th day of July, 1971.
"/s/ WARREN G. SUNDAY
Warren G. Sunday
*Notary Public*

above Petition by affidavit form on behalf of Ora Spitler McFarlin, to have Tubal Ligation performed upon her minor daughter, Linda Spitler, subject to said Ora Spitler McFarlin covenanting and agreeing to indemnify and keep indemnified Dr. John Hines and the DeKalb Memorial Hospital from any matters or causes of action arising therefrom."

On July 15, 1971, Linda Spitler entered the DeKalb Memorial Hospital, having been told that she was to have her appendix removed. The following day a tubal ligation was performed upon her. She was released several days later, unaware of the true nature of her surgery.

Approximately two years after the operation, Linda Spitler was married to respondent Leo Sparkman. Her inability to become pregnant led her to discover that she had been sterilized during the 1971 operation. As a result of this revelation, the Sparkmans filed suit in the United States District Court for the Northern District of Indiana against Mrs. McFarlin, her attorney, Judge Stump, the doctors who had performed and assisted in the tubal ligation, and the DeKalb Memorial Hospital. Respondents sought damages for the alleged violation of Linda Sparkman's constitutional rights;[2] also asserted were pendent state claims for assault

---

"My commission expires January 4, 1975.

---

"I, Harold D. Stump, Judge of the DeKalb Circuit Court, do hereby approve the above Petition by affidavit form on behalf of Ora Spitler McFarlin, to have Tubal Ligation performed upon her minor daughter, Linda Spitler, subject to said Ora Spitler McFarlin covenanting and agreeing to indemnify and keep indemnified Dr. John Hines and the DeKalb Memorial Hospital from any matters or causes of action arising therefrom.

"/s/ HAROLD D. STUMP
Judge, DeKalb Circuit Court

"Dated July 9, 1971"

[2] The District Court gave the following summary of the constitutional claims asserted by the Sparkmans:

"Whether laid under section 1331 or 1343 (3) and whether asserted

and battery, medical malpractice, and loss of potential fatherhood.

Ruling upon the defendants' various motions to dismiss the complaint, the District Court concluded that each of the constitutional claims asserted by respondents required a showing of state action and that the only state action alleged in the complaint was the approval by Judge Stump, acting as Circuit Court Judge, of the petition presented to him by Mrs. McFarlin. The Sparkmans sought to hold the private defendants liable on a theory that they had conspired with Judge Stump to bring about the allegedly unconstitutional acts. The District Court, however, held that no federal action would lie against any of the defendants because Judge Stump, the only state agent, was absolutely immune from suit under the doctrine of judicial immunity. The court stated that "whether or not Judge Stump's 'approval' of the petition may in retrospect appear to have been premised on an erroneous

---

directly or via section 1983 and 1985, plaintiffs' grounds for recovery are asserted to rest on the violation of constitutional rights. Plaintiffs urge that defendants violated the following constitutional guarantees:

"1. that the actions were arbitrary and thus in violation of the due process clause of the Fourteenth Amendment;

"2. that Linda was denied procedural safeguards required by the Fourteenth Amendment;

"3. that the sterilization was permitted without the promulgation of standards;

"4. that the sterilization was an invasion of privacy;

"5. that the sterilization violated Linda's right to procreate;

"6. that the sterilization was cruel and unusual punishment;

"7. that the use of sterilization as punishment for her alleged retardation or lack of self-discipline violated various constitutional guarantees;

"8. that the defendants failed to follow certain Indiana statutes, thus depriving Linda of due process of law; and

"9. that defendants violated the equal protection clause, because of the differential treatment accorded Linda on account of her sex, marital status, and allegedly low mental capacity." *Sparkman* v. *McFarlin,* Civ. No. F 75-129 (ND Ind., May 13, 1976).

view of the law, Judge Stump surely had jurisdiction to consider the petition and to act thereon." *Sparkman* v. *McFarlin,* Civ. No. F 75–129 (ND Ind., May 13, 1976). Accordingly, under *Bradley* v. *Fisher,* 13 Wall. 335, 351 (1872), Judge Stump was entitled to judicial immunity.[3]

On appeal, the Court of Appeals for the Seventh Circuit reversed the judgment of the District Court,[4] holding that the "crucial issue" was "whether Judge Stump acted within his jurisdiction" and concluding that he had not. 552 F. 2d, at 174. He was accordingly not immune from damages liability under the controlling authorities. The Court of Appeals also held that the judge had forfeited his immunity "because of his failure to comply with elementary principles of procedural due process." *Id.,* at 176.

We granted certiorari, 434 U. S. 815 (1977), to consider the correctness of this ruling. We reverse.

## II

The governing principle of law is well established and is not questioned by the parties. As early as 1872, the Court recognized that it was "a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions, without apprehension of personal consequences to himself." *Bradley* v. *Fisher, supra,* at 347.[5] For that reason the Court held that "judges

---

[3] The District Court granted the defendants' motion to dismiss the federal claims for that reason and dismissed the remaining pendent state claims for lack of subject-matter jurisdiction.

[4] *Sparkman* v. *McFarlin,* 552 F. 2d 172 (CA7 1977).

[5] Even earlier, in *Randall* v. *Brigham,* 7 Wall. 523 (1869), the Court stated that judges are not responsible "to private parties in civil actions for their judicial acts, however injurious may be those acts, and however much they may deserve condemnation, unless perhaps where the acts are palpably in excess of the jurisdiction of the judges, and are done maliciously or corruptly." *Id.,* at 537. In *Bradley* the Court reconsidered that earlier

of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." [6] 13 Wall., at 351. Later we held that this doctrine of judicial immunity was applicable in suits under § 1 of the Civil Rights Act of 1871, 42 U. S. C. § 1983, for the legislative record gave no indication that Congress intended to abolish this long-established principle. *Pierson* v. *Ray*, 386 U. S. 547 (1967).

The Court of Appeals correctly recognized that the necessary inquiry in determining whether a defendant judge is immune from suit is whether at the time he took the challenged action he had jurisdiction over the subject matter before him. Because "some of the most difficult and embarrassing questions which a judicial officer is called upon to consider and determine relate to his jurisdiction . . . ," *Bradley, supra,* at 352, the scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge. A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only

---

statement and concluded that "the qualifying words used were not necessary to a correct statement of the law . . . ." 13 Wall., at 351.

[6] In holding that a judge was immune for his judicial acts, even when such acts were performed in excess of his jurisdiction, the Court in *Bradley* stated:

"A distinction must be here observed between excess of jurisdiction and the clear absence of all jurisdiction over the subject-matter. Where there is clearly no jurisdiction over the subject-matter any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible. But where jurisdiction over the subject-matter is invested by law in the judge, or in the court which he holds, the manner and extent in which the jurisdiction shall be exercised are generally as much questions for his determination as any other questions involved in the case, although upon the correctness of his determination in these particulars the validity of his judgments may depend." *Id.,* at 351–352.

when he has acted in the "clear absence of all jurisdiction." [7] 13 Wall., at 351.

We cannot agree that there was a "clear absence of all jurisdiction" in the DeKalb County Circuit Court to consider the petition presented by Mrs. McFarlin. As an Indiana Circuit Court Judge, Judge Stump had "original exclusive jurisdiction in all cases at law and in equity whatsoever . . . ," jurisdiction over the settlement of estates and over guardianships, appellate jurisdiction as conferred by law, and jurisdiction over "all other causes, matters and proceedings where exclusive jurisdiction thereof is not conferred by law upon some other court, board or officer." Ind. Code § 33–4–4–3 (1975).[8] This is indeed a broad jurisdictional grant; yet the Court of Appeals concluded that Judge Stump did not have jurisdiction over the petition authorizing Linda Sparkman's sterilization.

---

[7] In *Bradley,* the Court illustrated the distinction between lack of jurisdiction and excess of jurisdiction with the following examples: if a probate judge, with jurisdiction over only wills and estates, should try a criminal case, he would be acting in the clear absence of jurisdiction and would not be immune from liability for his action; on the other hand, if a judge of a criminal court should convict a defendant of a nonexistent crime, he would merely be acting in excess of his jurisdiction and would be immune. *Id.,* at 352.

[8] Indiana Code § 33–4–4–3 (1975) states as follows:

"Jurisdiction.—Said court shall have original exclusive jurisdiction in all cases at law and in equity whatsoever, and in criminal cases and actions for divorce, except where exclusive or concurrent jurisdiction is, or may be conferred by law upon justices of the peace. It shall also have exclusive jurisdiction of the settlement of decedents' estates and of guardianships: Provided, however, That in counties in which criminal or superior courts exist or may be organized, nothing in this section shall be construed to deprive such courts of the jurisdiction conferred upon them by laws, and it shall have such appellate jurisdiction as may be conferred by law, and it shall have jurisdiction of all other causes, matters and proceedings where exclusive jurisdiction thereof is not conferred by law upon some other court, board or officer."

In so doing, the Court of Appeals noted that the Indiana statutes provided for the sterilization of institutionalized persons under certain circumstances, see Ind. Code §§ 16–13–13–1 through 16–13–13–4 (1973), but otherwise contained no express authority for judicial approval of tubal ligations. It is true that the statutory grant of general jurisdiction to the Indiana circuit courts does not itemize types of cases those courts may hear and hence does not expressly mention sterilization petitions presented by the parents of a minor. But in our view, it is more significant that there was no Indiana statute and no case law in 1971 prohibiting a circuit court, a court of general jurisdiction, from considering a petition of the type presented to Judge Stump. The statutory authority for the sterilization of institutionalized persons in the custody of the State does not warrant the inference that a court of general jurisdiction has no power to act on a petition for sterilization of a minor in the custody of her parents, particularly where the parents have authority under the Indiana statutes to "consent to and contract for medical or hospital care or treatment of [the minor] including surgery." Ind. Code § 16–8–4–2 (1973). The District Court concluded that Judge Stump had jurisdiction under § 33–4–4–3 to entertain and act upon Mrs. McFarlin's petition. We agree with the District Court, it appearing that neither by statute nor by case law has the broad jurisdiction granted to the circuit courts of Indiana been circumscribed to foreclose consideration of a petition for authorization of a minor's sterilization.

The Court of Appeals also concluded that support for Judge Stump's actions could not be found in the common law of Indiana, relying in particular on the Indiana Court of Appeals' intervening decision in *A. L.* v. *G. R. H.*, 163 Ind. App. 636, 325 N. E. 2d 501 (1975). In that case the Indiana court held that a parent does not have a common-law right to have a minor child sterilized, even though the parent might "sincerely believe the child's adulthood would benefit therefrom." *Id.*, at 638, 325 N. E. 2d, at 502. The opinion, however,

speaks only of the rights of the parents to consent to the sterilization of their child and does not question the *jurisdiction* of a circuit judge who is presented with such a petition from a parent. Although under that case a circuit judge would err as a matter of law if he were to approve a parent's petition seeking the sterilization of a child, the opinion in *A. L. v. G. R. H.* does not indicate that a circuit judge is without jurisdiction to entertain the petition. Indeed, the clear implication of the opinion is that, when presented with such a petition, the circuit judge should deny it on its merits rather than dismiss it for lack of jurisdiction.

Perhaps realizing the broad scope of Judge Stump's jurisdiction, the Court of Appeals stated that, even if the action taken by him was not foreclosed under the Indiana statutory scheme, it would still be "an illegitimate exercise of his common law power because of his failure to comply with elementary principles of procedural due process." 552 F. 2d, at 176. This misconceives the doctrine of judicial immunity. A judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors. The Court made this point clear in *Bradley*, 13 Wall., at 357, where it stated: "[T]his erroneous manner in which [the court's] jurisdiction was exercised, however it may have affected the validity of the act, did not make the act any less a judicial act; nor did it render the defendant liable to answer in damages for it at the suit of the plaintiff, as though the court had proceeded without having any jurisdiction whatever . . . ."

We conclude that the Court of Appeals, employing an unduly restrictive view of the scope of Judge Stump's jurisdiction, erred in holding that he was not entitled to judicial immunity. Because the court over which Judge Stump presides is one of general jurisdiction, neither the procedural errors he may have committed nor the lack of a specific statute authorizing his approval of the petition in question ren-

dered him liable in damages for the consequences of his actions.

The respondents argue that even if Judge Stump had jurisdiction to consider the petition presented to him by Mrs. McFarlin, he is still not entitled to judicial immunity because his approval of the petition did not constitute a "judicial" act. It is only for acts performed in his "judicial" capacity that a judge is absolutely immune, they say. We do not disagree with this statement of the law, but we cannot characterize the approval of the petition as a nonjudicial act.

Respondents themselves stated in their pleadings before the District Court that Judge Stump was "clothed with the authority of the state" at the time that he approved the petition and that "he was acting as a county circuit court judge." Plaintiffs' Reply Brief to Memorandum Filed on Behalf of Harold D. Stump in Support of his Motion to Dismiss in Civ. No. F 75–129, p. 6. They nevertheless now argue that Judge Stump's approval of the petition was not a judicial act because the petition was not given a docket number, was not placed on file with the clerk's office, and was approved in an *ex parte* proceeding without notice to the minor, without a hearing, and without the appointment of a guardian *ad litem*.

This Court has not had occasion to consider, for purposes of the judicial immunity doctrine, the necessary attributes of a judicial act; but it has previously rejected the argument, somewhat similar to the one raised here, that the lack of formality involved in the Illinois Supreme Court's consideration of a petitioner's application for admission to the state bar prevented it from being a "judicial proceeding" and from presenting a case or controversy that could be reviewed by this Court. *In re Summers*, 325 U. S. 561 (1945). Of particular significance to the present case, the Court in *Summers* noted the following: "The record does not show that any process issued or that any appearance was made. . . . While no entry was placed by the Clerk in the file, on a docket, or in a judgment roll, the Court took cognizance of the petition and

passed an order which is validated by the signature of the presiding officer." *Id.*, at 567. Because the Illinois court took cognizance of the petition for admission and acted upon it, the Court held that a case or controversy was presented.

Similarly, the Court of Appeals for the Fifth Circuit has held that a state district judge was entitled to judicial immunity, even though "at the time of the altercation [giving rise to the suit] Judge Brown was not in his judge's robes, he was not in the courtroom itself, and he may well have violated state and/or federal procedural requirements regarding con-tempt citations." *McAlester* v. *Brown,* 469 F. 2d 1280, 1282 (1972).[9] Among the factors relied upon by the Court of Appeals in deciding that the judge was acting within his judicial capacity was the fact that "the confrontation arose directly and immediately out of a visit to the judge in his official capacity." *Ibid.*[10]

---

[9] In *McAlester* the plaintiffs alleged that they had gone to the courthouse where their son was to be tried by the defendant in order to give the son a fresh set of clothes. When they went into the defendant judge's office, he allegedly ordered them out and had a deputy arrest one of them and place him in jail for the rest of the day. Several months later, the judge issued an order holding the plaintiff in contempt of court, *nunc pro tunc.*

[10] Other Courts of Appeals, presented with different fact situations, have concluded that the challenged actions of defendant judges were not performed as part of the judicial function and that the judges were thus not entitled to rely upon the doctrine of judicial immunity. The Court of Appeals for the Ninth Circuit, for example, has held that a justice of the peace who was accused of forcibly removing a man from his courtroom and physically assaulting him was not absolutely immune. *Gregory* v. *Thompson,* 500 F. 2d 59 (1974). While the court recognized that a judge has the duty to maintain order in his courtroom, it concluded that the actual eviction of someone from the courtroom by use of physical force, a task normally performed by a sheriff or bailiff, was "simply not an act of a judicial nature." *Id.*, at 64. And the Court of Appeals for the Sixth Circuit held in *Lynch* v. *Johnson,* 420 F. 2d 818 (1970), that the county judge sued in that case was not entitled to judicial immunity because his service on a board with only legislative and administrative powers did not constitute a judicial act.

The relevant cases demonstrate that the factors determining whether an act by a judge is a "judicial" one relate to the nature of the act itself, *i. e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i. e.*, whether they dealt with the judge in his judicial capacity. Here, both factors indicate that Judge Stump's approval of the sterilization petition was a judicial act.[11] State judges with general jurisdiction not infrequently are called upon in their official capacity to approve petitions relating to the affairs of minors, as for example, a petition to settle a minor's claim. Furthermore, as even respondents have admitted, at the time he approved the petition presented to him by Mrs. McFarlin, Judge Stump was "acting as a county circuit court judge." See *supra,* at 360. We may infer from the record that it was only because Judge Stump served in that position that Mrs. McFarlin, on the advice of counsel, submitted the petition to him for his approval. Because Judge Stump performed the type of act normally performed only by judges and because he did so in his capacity as a Circuit Court Judge, we find no

---

[11] MR. JUSTICE STEWART, in dissent, complains that this statement is inaccurate because it nowhere appears that judges are normally asked to approve parents' decisions either with respect to surgical treatment in general or with respect to sterilizations in particular. Of course, the opinion makes neither assertion. Rather, it is said that Judge Stump was performing a "function" normally performed by judges and that he was taking "the type of action" judges normally perform. The dissent makes no effort to demonstrate that Judge Stump was without jurisdiction to entertain and act upon the specific petition presented to him. Nor does it dispute that judges normally entertain petitions with respect to the affairs of minors. Even if it is assumed that in a lifetime of judging, a judge has acted on only one petition of a particular kind, this would not indicate that his function in entertaining and acting on it is not the kind of function that a judge normally performs. If this is the case, it is also untenable to claim that in entertaining the petition and exercising the jurisdiction with which the statutes invested him, Judge Stump was nevertheless not performing a judicial act or was engaging in the kind of conduct not expected of a judge under the Indiana statutes governing the jurisdiction of its courts.

merit to respondents' argument that the informality with which he proceeded rendered his action nonjudicial and deprived him of his absolute immunity.[12]

Both the Court of Appeals and the respondents seem to suggest that, because of the tragic consequences of Judge Stump's actions, he should not be immune. For example, the Court of Appeals noted that "[t]here are actions of purported judicial character that a judge, even when exercising general jurisdiction, is not empowered to take," 552 F. 2d, at 176, and respondents argue that Judge Stump's action was "so unfair" and "so totally devoid of judicial concern for the interests and well-being of the young girl involved" as to disqualify it as a judicial act. Brief for Respondents 18. Disagreement with the action taken by the judge, however, does not justify depriving that judge of his immunity. Despite the unfairness to litigants that sometimes results, the doctrine of judicial immunity is thought to be in the best interests of "the proper administration of justice . . . [, for it allows] a judicial officer, in exercising the authority vested in him [to] be free to act upon his own convictions, without apprehension of personal consequences to himself." *Bradley* v. *Fisher*, 13

---

[12] Mr. Justice Stewart's dissent, *post*, at 369, suggests that Judge Stump's approval of Mrs. McFarlin's petition was not a judicial act because of the absence of what it considers the "normal attributes of a judicial proceeding." These attributes are said to include a "case," with litigants and the opportunity to appeal, in which there is "principled decisionmaking." But under Indiana law, Judge Stump had jurisdiction to act as he did; the proceeding instituted by the petition placed before him was sufficiently a "case" under Indiana law to warrant the exercise of his jurisdiction, whether or not he then proceeded to act erroneously. That there were not two contending litigants did not make Judge Stump's act any less judicial. Courts and judges often act *ex parte*. They issue search warrants in this manner, for example, often without any "case" having been instituted, without any "case" ever being instituted, and without the issuance of the warrant being subject to appeal. Yet it would not destroy a judge's immunity if it is alleged and offer of proof is made that in issuing a warrant he acted erroneously and without principle.

Wall., at 347. The fact that the issue before the judge is a controversial one is all the more reason that he should be able to act without fear of suit. As the Court pointed out in *Bradley:*

> "Controversies involving not merely great pecuniary interests, but the liberty and character of the parties, and consequently exciting the deepest feelings, are being constantly determined in those courts, in which there is great conflict in the evidence and great doubt as to the law which should govern their decision. It is this class of cases which impose upon the judge the severest labor, and often create in his mind a painful sense of responsibility." *Id.,* at 348.

The Indiana law vested in Judge Stump the power to entertain and act upon the petition for sterilization. He is, therefore, under the controlling cases, immune from damages liability even if his approval of the petition was in error. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.[13]

*It is so ordered.*

MR. JUSTICE BRENNAN took no part in the consideration or decision of this case.

MR. JUSTICE STEWART, with whom MR. JUSTICE MARSHALL and MR. JUSTICE POWELL join, dissenting.

It is established federal law that judges of general jurisdiction are absolutely immune from monetary liability "for their

---

[13] The issue is not presented and we do not decide whether the District Court correctly concluded that the federal claims against the other defendants were required to be dismissed if Judge Stump, the only state agent, was found to be absolutely immune. Compare *Kermit Constr. Corp.* v. *Banco Credito y Ahorro Ponceno,* 547 F. 2d 1 (CA1 1976), with *Guedry* v. *Ford,* 431 F. 2d 660 (CA5 1970).

judicial acts, even when such acts are in excess of their juris-
diction, and are alleged to have been done maliciously or
corruptly." *Bradley* v. *Fisher,* 13 Wall. 335, 351. It is also
established that this immunity is in no way diminished in a
proceeding under 42 U. S. C. § 1983. *Pierson* v. *Ray,* 386
U. S. 547. But the scope of judicial immunity is limited to
liability for "judicial acts," and I think that what Judge Stump
did on July 9, 1971, was beyond the pale of anything that
could sensibly be called a judicial act.

Neither in *Bradley* v. *Fisher* nor in *Pierson* v. *Ray* was there
any claim that the conduct in question was not a judicial act,
and the Court thus had no occasion in either case to discuss
the meaning of that term.[1] Yet the proposition that judicial
immunity extends only to liability for "judicial acts" was
emphasized no less than seven times in Mr. Justice Field's
opinion for the Court in the *Bradley* case.[2] Cf. *Imbler* v.
*Pachtman,* 424 U. S. 409, 430. And if the limitations inherent
in that concept have any realistic meaning at all, then I
cannot believe that the action of Judge Stump in approving
Mrs. McFarlin's petition is protected by judicial immunity.

The Court finds two reasons for holding that Judge Stump's
approval of the sterilization petition was a judicial act. First,
the Court says, it was "a function normally performed by a
judge." Second, the Court says, the act was performed in
Judge Stump's "judicial capacity." With all respect, I think
that the first of these grounds is factually untrue and that the
second is legally unsound.

When the Court says that what Judge Stump did was an
act "normally performed by a judge," it is not clear to me
whether the Court means that a judge "normally" is asked to
approve a mother's decision to have her child given surgical

---

[1] In the *Bradley* case the plaintiff was a lawyer who had been disbarred;
in the *Pierson* case the plaintiffs had been found guilty after a criminal
trial.

[2] See 13 Wall., at 347, 348, 349, 351, 354, 357.

treatment generally, or that a judge "normally" is asked to approve a mother's wish to have her daughter sterilized. But whichever way the Court's statement is to be taken, it is factually inaccurate. In Indiana, as elsewhere in our country, a parent is authorized to arrange for and consent to medical and surgical treatment of his minor child. Ind. Code § 16–8–4–2 (1973). And when a parent decides to call a physician to care for his sick child or arranges to have a surgeon remove his child's tonsils, he does not, "normally" or otherwise, need to seek the approval of a judge.[3] On the other hand, Indiana did in 1971 have statutory procedures for the sterilization of certain people who were *institutionalized*. But these statutes provided for *administrative proceedings* before a board established by the superintendent of each public hospital. Only if, after notice and an evidentiary hearing, an order of sterilization was entered in these proceedings could there be review in a circuit court. See Ind. Code §§ 16–13–13–1 through 16–13–13–4 (1974).[4]

---

[3] This general authority of a parent was held by an Indiana Court of Appeals in 1975 not to include the power to authorize the sterilization of his minor child. *A. L. v. G. R. H.*, 163 Ind. App. 636, 325 N. E. 2d 501.

Contrary to the Court's conclusion, *ante,* at 359, that case does not in the least demonstrate that an Indiana judge is or ever was empowered to act on the merits of a petition like Mrs. McFarlin's. The parent in that case did not petition for judicial approval of her decision, but rather "filed a complaint for declaratory judgment seeking declaration of her right under the common-law attributes of the parent-child relationship to have her son . . . sterilized." 163 Ind. App., at 636–637, 325 N. E. 2d, at 501. The Indiana Court of Appeals' decision simply established a limitation on the parent's common-law rights. It neither sanctioned nor contemplated any procedure for judicial "approval" of the parent's decision.

Indeed, the procedure followed in that case offers an instructive contrast to the judicial conduct at issue here:

"At the outset, we thank counsel for their excellent efforts in representing a seriously concerned parent and in providing the guardian ad litem defense of the child's interest. *Id.,* at 638, 325 N. E. 2d, at 502.

[4] These statutes were repealed in 1974.

In sum, what Judge Stump did on July 9, 1971, was in no way an act "normally performed by a judge." Indeed, there is no reason to believe that such an act has ever been performed by *any* other Indiana judge, either before or since.

When the Court says that Judge Stump was acting in "his judicial capacity" in approving Mrs. McFarlin's petition, it is not clear to me whether the Court means that Mrs. McFarlin submitted the petition to him only because he was a judge, or that, in approving it, he *said* that he was acting as a judge. But however the Court's test is to be understood, it is, I think, demonstrably unsound.

It can safely be assumed that the Court is correct in concluding that Mrs. McFarlin came to Judge Stump with her petition because he was a County Circuit Court Judge. But false illusions as to a judge's power can hardly convert a judge's response to those illusions into a judicial act. In short, a judge's approval of a mother's petition to lock her daughter in the attic would hardly be a judicial act simply because the mother had submitted her petition to the judge in his official capacity.

If, on the other hand, the Court's test depends upon the fact that Judge Stump *said* he was acting in his judicial capacity, it is equally invalid. It is true that Judge Stump affixed his signature to the approval of the petition as "Judge, De Kalb Circuit Court." But the conduct of a judge surely does not become a judicial act merely on his own say-so. A judge is not free, like a loose cannon, to inflict indiscriminate damage whenever he announces that he is acting in his judicial capacity.[5]

---

[5] Believing that the conduct of Judge Stump on July 9, 1971, was not a judicial act, I do not need to inquire whether he was acting in "the clear absence of all jurisdiction over the subject matter." *Bradley* v. *Fisher*, 13 Wall., at 351. "Jurisdiction" is a coat of many colors. I note only that the Court's finding that Judge Stump had jurisdiction to entertain Mrs. McFarlin's petition seems to me to be based upon dangerously broad

If the standard adopted by the Court is invalid, then what is the proper measure of a judicial act? Contrary to implications in the Court's opinion, my conclusion that what Judge Stump did was not a judicial act is not based upon the fact that he acted with informality, or that he may not have been "in his judge's robes," or "in the courtroom itself." *Ante,* at 361. And I do not reach this conclusion simply "because the petition was not given a docket number, was not placed on file with the clerk's office, and was approved in an *ex parte* proceeding without notice to the minor, without a hearing, and without the appointment of a guardian *ad litem." Ante,* at 360.

It seems to me, rather, that the concept of what is a judicial act must take its content from a consideration of the factors that support immunity from liability for the performance of such an act. Those factors were accurately summarized by the Court in *Pierson* v. *Ray,* 386 U. S., at 554:

> "[I]t 'is . . . for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences.' . . . It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation."

Not one of the considerations thus summarized in the *Pierson* opinion was present here. There was no "case," con-

---

criteria. Those criteria are simply that an Indiana statute conferred "jurisdiction of all . . . causes, matters and proceedings," and that there was not in 1971 any Indiana law specifically prohibiting what Judge Stump did.

troversial or otherwise. There were no litigants. There was and could be no appeal. And there was not even the pretext of principled decisionmaking. The total absence of *any* of these normal attributes of a judicial proceeding convinces me that the conduct complained of in this case was not a judicial act.

The petitioners' brief speaks of "an aura of deism which surrounds the bench . . . essential to the maintenance of respect for the judicial institution." Though the rhetoric may be overblown, I do not quarrel with it. But if aura there be, it is hardly protected by exonerating from liability such lawless conduct as took place here. And if intimidation would serve to deter its recurrence, that would surely be in the public interest.[6]

MR. JUSTICE POWELL, dissenting.

While I join the opinion of MR. JUSTICE STEWART, I wish to emphasize what I take to be the central feature of this case—Judge Stump's preclusion of any possibility for the vindication of respondents' rights elsewhere in the judicial system.

*Bradley* v. *Fisher,* 13 Wall. 335 (1872), which established the absolute judicial immunity at issue in this case, recognized that the immunity was designed to further the public interest in an independent judiciary, sometimes at the expense of legitimate individual grievances. *Id.,* at 349; accord, *Pierson* v. *Ray,* 386 U. S. 547, 554 (1967). The *Bradley* Court accepted those costs to aggrieved individuals because the judicial system itself provided other means for protecting individual rights:

"Against the consequences of [judges'] erroneous or irregular action, from whatever motives proceeding, the law

---

[6] The only question before us in this case is the scope of judicial immunity. How the absence of a "judicial act" might affect the issue of whether Judge Stump was acting "under color of" state law within the meaning of 42 U. S. C. § 1983, or the issue of whether his act was that of the State within the meaning of the Fourteenth Amendment that need not, therefore, be pursued here.

has provided for private parties numerous remedies, and to those remedies they must, in such cases, resort." 13 Wall., at 354.

Underlying the *Bradley* immunity, then, is the notion that private rights can be sacrificed in some degree to the achievement of the greater public good deriving from a completely independent judiciary, because there exist alternative forums and methods for vindicating those rights.[1]

But where a judicial officer acts in a manner that precludes all resort to appellate or other judicial remedies that otherwise would be available, the underlying assumption of the *Bradley* doctrine is inoperative. See *Pierson* v. *Ray, supra,* at 554.[2] In this case, as MR. JUSTICE STEWART points out, *ante,* at 369, Judge Stump's unjudicial conduct insured that "[t]here was and could be no appeal." The complete absence of normal judicial process foreclosed resort to any of the "numerous remedies" that "the law has provided for private parties." *Bradley, supra,* at 354.

In sum, I agree with MR. JUSTICE STEWART that petitioner judge's actions were not "judicial," and that he is entitled to no judicial immunity from suit under 42 U. S. C. § 1983.

---

[1] See Handler & Klein, The Defense of Privilege in Defamation Suits Against Government Executive Officials, 74 Harv. L. Rev. 44, 53–55 (1960); Jaffe, Suits Against Governments and Officers: Damage Actions, 77 Harv. L. Rev. 209, 233–235 (1963); Note, Federal Executive Immunity From Civil Liability in Damages: A Reevaluation of *Barr* v. *Mateo,* 77 Colum. L. Rev. 625, 647 (1977).

[2] In both *Bradley* and *Pierson* any errors committed by the judges involved were open to correction on appeal.