Nina Loree Hunt, Asst. U.S. Atty., Atlanta, Ga., for defendants.

**Ethel Lee PAGE, Walter Thomas Page**

v.

**James C. GRADY, Special Agent, Michael Clark, Special Agent, Wilbur D. Owens, Judge, Michael C. Daniel, Assistant United States Attorney, Unknown Confidential Informant.**

**Civ. No. 1:91–cv–274–ODE.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 23, 1992.

### ORDER

ORINDA D. EVANS, District Judge.

This civil suit for damages and injunctive relief under *Bivens v. Six Unknown Name Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1970), is before the court on Defendant Owens' motion to dismiss filed November 15, 1991. Plaintiffs, who are acting *pro se,* have filed a brief in opposition; Defendant Owens has filed a reply brief. The sole purpose of this order is to address Defendant Owens' motion to dismiss. Motions to dismiss by the other named Defendants will be considered in a future order.

According to Plaintiffs' complaint and their amended complaint filed November 26, 1991, the relevant facts are as follows: In January 1990, Plaintiff Walter Thomas Page was indicted in the Middle District of Georgia, Macon Division ("District Court"). The indictment charged involvement in a 35 kilogram drug distribution conspiracy. On January 30, Mr. Page was arrested. On or about February 6, 1990, an affidavit of Defendant Michael M. Clarke, Special Agent of the Federal Bureau of Investigation ("FBI"), was presented to an unspecified official of the District Court in support of an application for a search warrant. Defendant Clarke's affidavit stated that a confidential informant, who had been reliable in the past, had stated that he/she had observed 8 to 10 kilos of cocaine at Page's residence on January 29, 1990; that the confidential informant had observed cocaine there on other occasions, and that drugs or drug evidence were in the walls or floor safes at other locations controlled by Mr. Page. A search warrant was signed

by the person to whom the Clarke affidavit was presented. The search was executed (the pleadings do not reflect the date of the search) but apparently no illegal drugs were found.

Subsequently, another affidavit of Defendant Clarke was presented to Magistrate Judge Claude W. Hicks, Jr. of the District Court. This affidavit set forth the basis for Defendant Clarke's belief that certain funds held in bank accounts at First Union National Bank constituted the proceeds of illegal drug activity by Plaintiff Walter Page. On February 23, 1990, Magistrate Judge Hicks signed a seizure warrant pursuant to which certain business bank accounts were seized.

Plaintiffs further allege that on or about March 21, 1990, Defendant James C. Grady, Special Agent of the FBI, signed an affidavit in support of a seizure warrant. This affidavit stated that a confidential informant, believed reliable, had informed Special Agent Grady that between June 1989 to January 30, 1990, Mr. Page had conspired with others to possess and distribute up to 35 kilograms of cocaine; that Mr. Page's involvement in the drug conspiracy had been indicated by consensually monitored telephone conversations made and received by Mr. Page at his residence and at business locations controlled by him; that through consensually monitored telephone calls on January 4, 1990 and January 5, 1990, Mr. Page had conspired to purchase 5 kilograms of cocaine; that Mr. Page had been indicted on drug conspiracy charges in the Middle District of Georgia on January 16, 1990; that a confidential informant had advised that drugs or drug evidence could be found in various locations controlled by Mr. Page. Defendant Grady's affidavit was presented to Defendant Owens, who signed a seizure warrant in reliance on the affidavit. Plaintiffs state that while the seizure warrant recites reliance upon "testimony" given by Special Agent Grady, in fact no "testimony" was taken that day.

The March 21 warrant resulted in the seizure of funds from certain personal bank accounts in the Plaintiffs' names at the First National Bank of Atlanta. Plaintiff Ethel Lee Page is the mother of Plaintiff Walter Page.

On an unspecified date following the foregoing search and seizure, the drug distribution charges against Plaintiff Walter Thomas Page were tried to a jury, with Defendant Owens presiding. Plaintiff Page was acquitted by the jury.

The Plaintiffs' specific complaints against Defendant Owens are as follows: (1) that Defendant Owens falsely recited in the March 21 seizure warrant that he had received "testimony" from Defendant Grady when in fact no "testimony" had been received; (2) that when the March 21, 1990 seizure warrant was signed by Defendant Owens, he knew Defendant Grady's affidavit was false, to the extent that it stated reliance on the informant who had observed drugs at locations controlled by Plaintiff Page, because by then the search pursuant to the February warrant had already been executed and no drugs had been found; (3) that when the March 21, 1990 seizure warrant was signed by Defendant Owens, he knew that Mr. Page was not a drug dealer in light of the explanation given by his co-defendant, a Mr. Beck, at the detention hearing following their arrest in January, 1990; and (4) that during the trial of Plaintiff Page on the drug distribution charges, Defendant Owens misused his judicial authority in unspecified ways to hide the truth and facts from the jury in a deliberate attempt to have the Plaintiff Walter Page found guilty by the jury.

Plaintiffs state in their amended complaint that injunctive relief only is sought as against Defendant Owens. The amended complaint is silent as to the exact nature of the requested injunctive relief, but the original complaint seeks the following: "Declaratory and injunctive relief granted against Defendant Owens to ensure that he never again uses his official position to deprive a citizen of his money when he knows the pleadings placed before him are deliberately false and fictitious for the United States Attorneys Office." In a brief filed December 26, 1991, Plaintiffs

state they seek an injunctive order which would require that all property seizure cases in the United States District Court for the Middle District of Georgia be assigned to judges other than Judge Owens. In addition to injunctive relief, Plaintiffs seek attorney's fees from Defendant Owens in connection with this action.

Defendant Owens has moved to dismiss this claim on the basis of absolute judicial immunity. Plaintiffs have opposed this motion, relying on the Supreme Court's decision *Pulliam v. Allen,* 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984) as support for the proposition that judicial immunity is not a bar to prospective equitable relief against federal judicial officers. Defendant Owens offers two responses. He first argues that the *Pulliam* exception to judicial immunity is inapplicable to suits against federal judges. In addition, he argues that Plaintiffs have failed to allege the necessary requisites to injunctive relief in their amended complaint.

At common law, judges of courts of general jurisdiction enjoyed absolute judicial immunity from civil suits. English law began with a position of general judicial immunity and developed only limited exceptions. Block, *Stump v. Sparkman and the History of Judicial Immunity,* 1980 Duke L.J. 879, 880 (hereinafter "Block"). Most of those exceptions involved prerogative writs, such as writs of mandamus and prohibition, intended to allow superior courts to oversee inferior courts and "to control the proper exercise of jurisdiction."

*Pulliam,* 466 U.S. at 549–550, 104 S.Ct. at 1985. (Powell, J., dissenting).

The rule of absolute judicial immunity was authoritatively adopted in this country during the mid-nineteenth century. In 1872, the Supreme Court recognized that it is:

> a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions without apprehension of personal consequences to himself.

*Bradley v. Fisher* 80 U.S. (13 Wall.) 335, 347, 20 L.Ed. 646 (1872) (quoted in *Stump v. Sparkman,* 435 U.S. 349, 355, 98 S.Ct. 1099, 1104, 55 L.Ed.2d 331 (1978)).[1] For that reason, the Court in *Bradley* held:

> judges of courts of superior or general jurisdiction are not liable to civil actions for judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly.

80 U.S. at 351.

*Bradley* was cited as controlling authority on the issue of judicial immunity for more than seventy years. Under its authority, and the authority of its progeny, *Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) and *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), numerous Circuit Courts adopted a rule of absolute judicial immunity for state judges who were sued for damages under 42 U.S.C. § 1983. *See* Block, at 906.[2] The Supreme Court even-

---

**1.** Even earlier, the Court had held that judges were not responsible:

> to private parties in civil actions for their judicial acts, however injurious may be those acts, and however much they may deserve condemnation, unless perhaps where the acts are palpably in excess of the jurisdiction of the judges and are done maliciously or corruptly.

*Randall v. Brigham,* 74 U.S. (7 Wall.) 523, 537, 19 L.Ed. 285 (1869) (quoted in *Stump,* 435 U.S. at 355 n. 5, 98 S.Ct. at 1104 n. 5).

**2.** Suits seeking equitable relief against judges under § 1983 were more uncommon than suits for damages. When such suits were prosecuted, they were "recurringly dismissed for a variety of reasons other than immunity." *Supreme Court*

*of Virginia v. Consumers Union of the United States,* 446 U.S. 719, 735 n. 13, 100 S.Ct. 1967, 1976 n. 13, 64 L.Ed.2d 641 (1980). For this reason, no clear rule relating to the applicability of absolute judicial immunity to equitable claims was established until the recent *Pulliam* decision. Nevertheless, some lower courts had considered the issue. Those that had were split on the issue of whether judicial immunity served as a bar to injunctive relief. *Compare Tate v. Arnold,* 223 F.2d 782, 786 (8th Cir.1955) (judicial immunity bars actions for injunctive relief under § 1983) with *Slavin v. Curry,* 574 F.2d 1256 (5th Cir.) (judicial immunity is no bar), *vacated as moot,* 583 F.2d 779 (5th Cir. 1978).

tually did the same in *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), stating:

> Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction, as this Court recognized when it adopted the doctrine, in *Bradley v. Fisher . . .* This immunity applies even when the judge is accused of acting maliciously and corruptly, and it "is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." . . . It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation.

386 U.S. at 553–54, 87 S.Ct. at 1217–18 (citations omitted).[3]

In *Pulliam v. Allen,* the Supreme Court confronted the issue of whether the doctrine of judicial immunity for damage suits, established in *Pierson,* also bars § 1983 suits for declaratory or injunctive relief against state judges. *Pulliam* involved an action against a state magistrate. The plaintiffs claimed that the magistrate's practice of imposing bail on persons arrested for nonjailable offenses, and incarcerating arrestees who could not make bail, was unconstitutional. The district court enjoined the practice and awarded attorney's fees pursuant to 42 U.S.C. § 1988. The

Fourth Circuit affirmed. *See Allen v. Burke,* 690 F.2d 376 (4th Cir.1982).

The Supreme Court granted certiorari to determine whether judicial immunity barred an award of attorney's fees under § 1988. As a threshold matter, however, the Court was forced to consider the more fundamental question of whether a judicial officer, acting in her judicial capacity, enjoyed absolute judicial immunity from prospective injunctive relief. 466 U.S. at 528, 104 S.Ct. at 1974. The Court concluded that judicial immunity was no bar to prospective injunctive relief against a state judge acting in her judicial capacity, nor to an award of attorney's fees under 42 U.S.C. § 1988. 466 U.S. at 542–44, 104 S.Ct. at 1981–82.

A careful review of the *Pulliam* case reveals that the Supreme Court grounded its decision on two considerations. The first was the fact that lawsuits against state officials, including state judges, were explicitly permitted by statute. The Court considered the intent of Congress in enacting 42 U.S.C. § 1983, and its predecessor, § 2 of the Civil Rights Act of 1866, stressing the fact that those two statutes were enacted:

> to provide an independent avenue for protection of federal constitutional rights. The remedy was considered necessary because "state courts were being used to harass and injure individuals, either because the state courts were powerless to stop deprivations or were in league with those who were bent upon abrogation of federally protected rights."

466 U.S. at 540, 104 S.Ct. at 1980 (citing *Mitchum v. Foster,* 407 U.S. 225, 240, 92 S.Ct. 2151, 2161, 32 L.Ed.2d 705 (1972)).

In conjunction with its conclusions regarding the history and purpose of § 1983, the *Pulliam* Court considered the common law origins of the principle of absolute judicial immunity. The Court reasoned

---

**3.** Because suits against federal officials were more uncommon, remaining virtually nonexistent until *Bivens v. Six Unknown Name Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1970), courts have rarely considered the applicability of absolute judicial immunity in suits against federal judges. Courts that did consider the issue generally held that the doctrine barred both actions for equitable relief and actions for damages. *See e.g., Smallwood v. United States,* 486 F.2d 1407 (8th Cir.), *aff'g,* 358 F.Supp. 398 (E.D.Mo.1973).

that this doctrine was influenced, in large part, by the strong tradition of superior court oversight of inferior courts. 466 U.S. at 532–33, 104 S.Ct. at 1976.[4] The Court concluded that, in this country, the common law tradition of superior court oversight had resulted in a somewhat limited tradition of absolute judicial immunity in suits seeking prospective collateral relief, as compared to suits seeking civil damages. This limitation on immunity was necessary in order to effectuate the oversight. For example, the ability of federal courts to enjoin unconstitutional actions of state court judges, pursuant to § 1983, relies on limitations of the doctrine of judicial immunity for state court judges.[5] The Court pointed out that, prior to *Pulliam*, several circuit courts had held that suits seeking equitable relief against state judges under § 1983 were not barred by the judicial immunity doctrine. *Id.* at 537, 104 S.Ct. at 1978.[6]

The Supreme Court, in reconciling the fact that § 1983 explicitly permits private lawsuits against state officials, including judges, with the limited applicability of absolute judicial immunity from suits for equitable relief, especially in cases which implicate superior court oversight of inferior courts, concluded that the common law doctrine of judicial immunity was relatively inconsequential in the *Pulliam* context. For this reason, the Court held that, for suits brought under § 1983, "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity." 466 U.S. at 541–42, 104 S.Ct. at 1981.

Plaintiffs contend that the *Pulliam* decision compels the court to discard Defendant Owens' absolute immunity defense in this suit under *Bivens v. Six Unknown Name Agents of the Federal Bureau of Narcotics.* After a careful review of the majority opinion in *Pulliam*, and the rationale for that decision, the court must disagree. The court finds that the *Pulliam* decision, which abrogates judicial immunity for suits seeking injunctive relief under § 1983, is inapplicable to *Bivens* actions against federal judges.

A *Bivens* action, unlike a suit under § 1983, is a judicially created remedy. The absence of an explicit Congressional statute permitting suits against federal officials, something which exists in the § 1983 context, demonstrates that one of the two fundamental elements on which the *Pulliam* Court relied in determining that judicial immunity does not bar suits for prospective relief against state judges, does not exist in the *Bivens* context.

Absent an express statute like § 1983, the only factor which was considered by the majority in *Pulliam*, and which is applicable in this *Bivens* case, is the tradition of judicial immunity from suits seeking equitable relief. The legacy of judicial immunity from suits for equitable relief is certainly less established than the tradition of immunity from damage suits. As discussed above, however, this is the result of a common law system in which superior courts had the ability to oversee, and control, inferior courts. This history is not implicated in cases, like the instant case, in

4. In discussing the history of judicial oversight in English common law, the *Pulliam* majority explained:

[t]he King's Bench exercised significant collateral control over inferior and rival courts through the use of prerogative writs ... Most interesting for our current purposes are the writs of prohibition and mandamus. The writs issued against a judge, in theory to prevent him from exceeding his jurisdiction or to require him to exercise it... In practice, controlling an inferior court in the proper exercise of its jurisdiction meant that the King's Bench used and continues to use the writs to prevent a judge from committing all manner of errors, including departing from

the rules of natural justice, proceeding with a suit in which he has an interest, misconstruing substantive law, and rejecting legal evidence.
466 U.S. at 532–33, 104 S.Ct. at 1976 (citation and footnote omitted).

5. The Court equated federal court power to enjoin unconstitutional actions of state court judges, pursuant to § 1983, with the ability of superior courts to exercise control over inferior courts at common law.

6. The Supreme Court, however, had never adopted such a rule. *Id.* at 536–37, 104 S.Ct. at 1978.

which a plaintiff seeks a federal court injunction enjoining the acts or practices of a co-equal federal court.

After a review of the applicable case law, the court finds precedent for a principle of immunity from actions seeking injunctive relief from judges, especially in cases which do not implicate superior (federal) court oversight of inferior (state) courts. *See Smallwood,* cited *supra.* Further, the court concludes that nothing in the common law would "suggest[ ]—much less requires—the distinction ... between suits for prospective relief (with the attendant liability for costs and attorney's fees) and suits for damages" for purposes of judicial immunity in *Bivens* actions. *See* 466 U.S. at 546, 104 S.Ct. at 1983 (Powell, J., dissenting). Because the principle of judicial immunity in equity actions is established, and because no Congressional mandate counsels otherwise, the court finds that the doctrine of absolute judicial immunity bars Plaintiffs' *Bivens* action for equitable relief against Judge Owens.

Additional considerations bolster this conclusion. First, *Bivens* actions are a judicially created remedy. As such, federal courts necessarily have the responsibility for delineating the boundaries of the cause of action. In the instant context, the court believes that strong policy considerations point in the direction of retaining the absolute immunity defense in both damages and equity actions under *Bivens.* As explained by Justice Powell:

> The ever-present threat of burdensome litigation ... may well influence judicial determinations, particularly in close cases where the decision is likely to be unpopular.
> Suits for injunctive relief may pose even greater threats to judicial independence if they are successful and an injunction is ordered. The specter of contempt pro-

ceedings for alleged violations of injunctive orders is likely to inhibit unbiased judicial decisionmaking as much as the threat of liability for damages ... . The threat of contempt—with the possibility of a fine or even imprisonment—could well deter even the most courageous judge from exercising this discretion independently and free from intimidation.

466 U.S. at 555, 104 S.Ct. at 1987–88.[7]

There is an additional policy concern which is unique to *Bivens* cases involving federal judges. If judicial immunity was not a bar to injunctive relief against federal judges, the end result would be a state of affairs in which one federal court would be required, at the request of a disgruntled litigant, to review the actions or practices of a co-equal federal court.[8] Aside from the obvious efficiency concerns which are raised when unsatisfied litigants are permitted to "appeal" to co-equal federal courts for relief, this rule would initiate a new means of oversight for the federal judiciary. Unlike the § 1983 context, in which there exists a long tradition of federal judicial oversight of state officials, premised on Congressional statute, there is no precedent for permitting one federal court to oversee, and effectively overrule, a co-equal court. This concern is made particularly vivid when one considers that, if injunctive relief were available against federal judges in *Bivens* action, there would be no formal limit on the power of a federal district court to enjoin actions or practices of a United States Court of Appeals Judge or a Justice of the United States Supreme Court. The court does not believe that *Bivens* was intended to permit a federal district judge to undertake this sort of unseemly interference with the actions of co-equal or superior judicial officers. For this additional reason, the court finds that *Pul-*

7. The court acknowledges that this policy consideration also exists in the § 1983 context. As is evident from the majority opinion in *Pulliam,* however, it was counterbalanced by an explicit Congressional authorization, in § 1983, permitting suits against state officials.

8. Of course, this assumes that the litigant could satisfy the limitations already imposed by the

requirements for obtaining equitable relief against any defendant—"a showing of an inadequate remedy at law and of a serious risk of irreparable harm." *Pulliam,* 466 U.S. at 537, 104 S.Ct. at 1978 (quoting *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506–07, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959)).

*liam* is inapplicable to this case and that the doctrine of absolute judicial immunity bars Plaintiffs' suit for equitable relief against Judge Owens.[9]

██ Plaintiffs' complaint is subject to dismissal under Rule 12(b)(6) for a second, independent reason. Even assuming that judicial immunity did not bar their claim, Plaintiffs have still failed to allege sufficient facts to show an entitlement to injunctive relief against Defendant Owens.

> To be entitled to injunctive relief:
> a plaintiff must first establish the fact of the violation. *Rizzo v. Goode,* [423 U.S. 362, 377, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976)]. He must then demonstrate the presence of two elements: continuing irreparable injury if the injunction does not issue, and the lack of an adequate remedy at law. *Beacon Theatres, Inc. v. Westover,* [359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)].

*Newman v. State of Alabama,* 683 F.2d 1312 (11th Cir.1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1773, 76 L.Ed.2d 346 (1983). A review of the record in this case reveals that Plaintiffs' proceedings before Judge Owens have terminated. Plaintiffs do not allege that the allegedly unconstitutional acts of Defendant Owens are part of a pattern of conduct or that others are similarly situated to them. In fact, the pleadings suggest that Plaintiffs' allegations are idiosyncratic to the facts of their own case. Because no facts are alleged which would support a finding of continuing irreparable injury, Defendant Owens is entitled to dismissal of the complaint against him.

Accordingly, Defendant Owens' motion to dismiss [# 13–1] is GRANTED.

SO ORDERED.

---

9. The court notes that in *Mullis v. U.S. Bankruptcy Court, Dist. of Nevada,* 828 F.2d 1385 (9th Cir.1987), the Ninth Circuit reached an identical result, albeit for different reasons. *Mullis* reasoned that, in a *Bivens* action for equitable relief against a federal judge, a plaintiff's remedy at law will always be adequate. 828 F.2d at 1391–93.