553 S.E.2d 496

Tim WILLIAMS, Appellant,

v.

Charles M. CONDON, individually and as Attorney General of South Carolina, W. Barney Giese, individually and as Solicitor of the Fifth Judicial Circuit of South Carolina, Douglas A. Churdar, and Robert Cook, Defendants,

of whom Charles M. Condon, individually and as Attorney General of South Carolina and W. Barney Giese, individually and as Solicitor of the Fifth Judicial Circuit of South Carolina are, Respondents.

No. 3392.

Court of Appeals of South Carolina.

Heard June 5, 2001.

Decided Oct. 1, 2001.

Francis T. Draine, of Columbia, for appellant.

Vinton D. Lide, of Lexington; and J. Emory Smith, Jr., of Columbia, for respondents.

ANDERSON, J.:

Tim Williams sued Charles M. Condon and W. Barney Giese, individually and in their official capacities, seeking damages resulting from their alleged violations of 42 U.S.C.A. § 1983 and common law tortious conduct. Condon is the Attorney General of South Carolina. Giese is the Solicitor of the Fifth Judicial Circuit. Condon and Giese, asserting their immunity as prosecutors, moved pursuant to Rule 12(b)(6) for dismissal of Williams' action. The Circuit Court granted the motion and dismissed the case. We affirm.

## FACTS/PROCEDURAL HISTORY

Williams was an employee of Premier Investigations ("Premier"), a Florida corporation. At the time the events giving rise to this dispute occurred, Premier's principal place of business was North Carolina with operations in South Carolina. Robert Cook, a North Carolinian, was Premier's chief executive officer. Williams, a resident of Richland County, sued Premier and Cook in South Carolina for unpaid wages and other compensation. Premier and Cook confessed judgment. Soon after, Cook accused Williams of sending a letter to other former employees of Premier that allegedly contained language inciting the recipients to also sue for back pay. Cook alerted Giese to the matter. Giese's office conducted an investigation of Williams' alleged activities. This investigation included interviewing Cook, Tim Belue, a former South Carolina employee of Premier, and Belue's former wife, Candace Belue. Giese elected to prosecute Williams for barratry. The grand jury returned a direct indictment of Williams on this charge.

Giese called the case for trial; however, before proceedings began, the presiding circuit judge recused himself and suggested referral of the prosecution to the Attorney General. Condon assumed responsibility for the matter. At trial, the court found the State's evidence could not support a conviction and directed a verdict, *sua sponte,* in Williams' favor.

Following the trial, Williams brought a civil suit naming, among others, Condon and Giese as defendants in both their individual and official capacities. Regarding his action against Condon and Giese, Williams asserted claims for violations of his constitutional rights under § 1983, false arrest, malicious prosecution, and negligence.

Specifically, Williams *alleged, inter alia,* the following:

- Condon and Giese colluded with Cook and attorney Douglas A. Churdar in initiating criminal proceedings against Williams;

- Condon and Giese were driven by malice, ill will, or recklessness in initiating and maintaining their respective prosecutions against him;

- Condon and Giese breached their duty to Williams by failing to properly investigate the accusations against him before proceeding with their respective prosecutions;

- Giese obtained Williams' direct indictment with evidence Williams asserted was insufficient, untrue, nonexistent, or unreliable (*i.e.,* the indictment was not supported by probable cause);

- Giese impermissibly deprived Williams of his procedural right to examine whether the State's charge was supported by probable cause;

- Giese unreasonably limited Williams' right to pretrial discovery by failing to respond to Williams' numerous requests and Rule 5, SCRCrimP motions for production of evidence demonstrating his guilt;

- Giese abused his power relating to the scheduling of criminal hearings and motions by refusing to set for oral argument Williams' Motion to Quash and Motion to Dismiss;

- Giese and Condon wrongly persisted in their respective prosecutions of Williams notwithstanding the fact Williams advised assistants of both Giese and Condon that the evidence gathered by the prosecution did not support a conviction;

- Condon unjustifiably refused Williams' request to intercede and protect Williams from Giese's prosecutorial abuse; and

- The Assistant Attorney General prosecuting the case on behalf of Condon harmed Williams by proceeding to trial and stating to the court that the State possessed evidence proving Williams' guilt beyond a reasonable doubt.

Giese and Condon responded to the complaint with a Rule 12(b)(6) motion to dismiss. The defendants sought dismissal pursuant to the defenses of prosecutorial immunity and the immunity afforded them under the South Carolina Tort Claims Act. The Circuit Court entertained oral argument regarding the motion and took the matter under advisement. In the interim, Williams attempted to conduct discovery. Condon and Giese moved for a protective order relieving them from the duty of responding to Williams' discovery requests. The court did not make a ruling as to the prosecutors' request. Williams persisted with discovery and filed a motion to compel. The Circuit Court ultimately granted Condon and Giese's dismissal motion. Williams' motion, however, was not addressed.

Eleven days after the dismissal, Williams moved the court to vacate its order, which he claimed came "as a big surprise," because its issuance "must have been a clerical oversight or mistake" due to his outstanding motion to compel discovery.[1] In a form order, the circuit judge denied Williams' motion. Williams appeals.

## ISSUE

Did the Circuit Court err in dismissing Williams' suit on the basis that his causes of action were barred by the common law doctrine of prosecutorial immunity and the immunity provided to prosecutors by the South Carolina Tort Claims Act?[2]

## STANDARD OF REVIEW

A trial judge in the civil setting may dismiss a claim when the defendant demonstrates the plaintiff has failed "to

---

1. We disagree with the dissent in regard to the conclusion that this Court lacks subject matter jurisdiction. We find under **all** the circumstances in this case that the notice of appeal was timely served. Concomitantly, we address the merits.

2. This one issue encapsulates all dispositive exceptions articulated by Williams in his brief.

state facts sufficient to constitute a cause of action" in the pleadings filed with the court. Rule 12(b)(6), SCRCP. The trial court's ruling on a Rule 12(b)(6) motion must be bottomed and premised solely upon the allegations set forth by the plaintiff. *Holy Loch Distribs. v. Hitchcock,* 332 S.C. 247, 503 S.E.2d 787 (Ct.App.1998), *rev'd on other grounds,* 340 S.C. 20, 531 S.E.2d 282 (2000); *Berry v. McLeod,* 328 S.C. 435, 492 S.E.2d 794 (Ct.App.1997). The motion will not be sustained if the facts alleged and the inferences reasonably deducible from the pleadings would entitle the plaintiff to relief on any theory of the case. *Brown v. Leverette,* 291 S.C. 364, 353 S.E.2d 697 (1987); *McCormick v. England,* 328 S.C. 627, 494 S.E.2d 431 (Ct.App.1997). The question to be considered is whether, in the light most favorable to the plaintiff, the pleadings articulate any valid claim for relief. *Toussaint v. Ham,* 292 S.C. 415, 357 S.E.2d 8 (1987); *Cowart v. Poore,* 337 S.C. 359, 523 S.E.2d 182 (Ct.App.1999).

■ Dismissal of an action pursuant to Rule 12(b)(6) is appealable. S.C.Code Ann. §§ 14–3–330(1) & (2)(c) (Supp. 2000), *cited in* James F. Flanagan, *South Carolina Civil Procedure* 95 (2d ed.1996) (footnote omitted). Upon review, the appellate tribunal applies the same standard of review that was implemented by the trial court. *See O'Laughlin v. Windham,* 330 S.C. 379, 382, 498 S.E.2d 689, 691 (Ct.App.1998) ("The grant of a motion to dismiss will be sustained only if the facts alleged in the complaint do not support relief under any theory of law.") (citing *Stiles v. Onorato,* 318 S.C. 297, 457 S.E.2d 601 (1995)).

### *LAW/ANALYSIS*

## I. Civil Suits Against Prosecutors in Their Individual Capacities

American courts have long recognized the existence of immunity for public officers from personal liability for tortious acts committed while serving in an official capacity. It is a common law tradition with origins that can be traced to the ancient tribunals of England. The protections afforded by this doctrine extend to the prosecutors who act on behalf of the people.

## A. Origins of Prosecutorial Immunity in the United States

"The function of the prosecutor that most often invites a [lawsuit] is his decision to initiate a prosecution, as this may lead to a suit for malicious prosecution." *Imbler v. Pachtman,* 424 U.S. 409, 421, 96 S.Ct. 984, 990, 47 L.Ed.2d 128 (1976).

The first case appearing in American jurisprudence devoted to the question of a prosecutor's amenability to civil suit for malicious prosecution is *Griffith v. Slinkard,* 146 Ind. 117, 44 N.E. 1001 (1896). *Imbler* at 421, 96 S.Ct. at 990–91. Griffith and Mullins were referred to a grand jury for setting fire to a barn and attempting to defraud the insurance company that insured the structure. Slinkard was the prosecutor who presented the state's case to the grand jury. The panel voted against the indictment of Griffith. Nevertheless, Slinkard included Griffith's name in the indictment and it was "true billed." Consequently, Griffith was arrested and tried. He was ultimately acquitted. Griffith subsequently sued Slinkard for, *inter alia,* malicious prosecution.

The Indiana Supreme Court pursued a two-step analysis in considering whether Slinkard could be sued for his participation in Griffith's wrongful indictment. It initially gauged the prosecutor's place in the judicial system by asking: "Is a prosecuting attorney an officer intrusted with the administration of justice?" *Id.* at 1002 (citation omitted). The court concluded:

> He is a judicial officer, created by the constitution of the state. He is the law officer to whom is intrusted all prosecutions for felonies and misdemeanors. He is the legal adviser of the grand jury. We think he is an officer intrusted with the administration of justice. The prosecuting attorney, therefore, is a judicial officer, but in the sense of a judge of a court.

*Id.* (citations and quotation marks omitted).

The court then contemplated whether there were personal repercussions for a prosecutor who abused his responsibilities to justice. It reported:

> The rule applicable to such an officer is thus stated by an eminent author: "Whenever duties of a judicial nature are imposed upon a public officer, the due execution of which

depends upon his own judgment, he is exempt from all responsibility by action for the motives which influence him and the manner in which said duties are performed. *If corrupt, he may be impeached or indicted; but he cannot be prosecuted by an individual to obtain redress for the wrong which may have been done. No public officer is responsible in a civil suit for a judicial determination, however erroneous it may be, and however malicious the motive which produced it."* Townsh. *Sland. & L.* (3d Ed.) § 227, pp. 395, 396.

*Id.* (emphasis added).

The *Griffith* holding became the clear majority rule concerning prosecutorial immunity. *Imbler,* 424 U.S. at 422, 96 S.Ct. at 991. The issue was eventually presented to the United States Supreme Court in *Yaselli v. Goff,* which affirmed the Court of Appeals' holding, 12 F.2d 396 (2d Cir. 1926), *in toto,* 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927).

The *Yaselli* Court began with an examination of judicial immunity:

There are weighty reasons why judicial officers should be shielded in the proper discharge of their official duties from harassing litigation at the suit of those who think themselves wronged by their decisions and that injustice has been done. A defeated party to a litigation may not only think himself wronged, but may attribute wrong motives to the judge whom he holds responsible for his defeat. He may think that the judge has allowed passion or prejudice to control his decision. To allow a judge to be sued in a civil action on a complaint charging the judge's acts were the result of partiality, or malice, or corruption, would deprive the judges of the protection which is regarded as essential to judicial independence. It is not in the public interests that such a suit should be maintained; and it is a fundamental principle of English and American jurisdiction that such an action cannot be maintained.

*Id.* at 399.

The court then launched into extensive quotation of English and American authorities reciting the proposition that judges are immune from personal liability for their judicial acts. What followed would be a tremendous pronouncement of law:

[T]he immunity which is extended to the judges is in like manner extended to the attorneys in the presentation of the client's case to the court or the jury.

*Id.* at 402.

Support for the application of immunity principles to the acts of a prosecutor ensued:

In *Munster v. Lamb,* 11 Q.B.D. 588, an action was brought against a solicitor for damages arising out of defamatory statements alleged to have been falsely and maliciously made by defendant concerning the plaintiff while the defendant was acting as a solicitor for a client against whom criminal proceedings had been instituted by the plaintiff who was a barrister. The statements complained of were so untrue and improper as stated in the court's opinion that defendant "did not attempt to justify the expressions used by him. It was impossible to do so." The court held that the words spoken were irrelevant to the facts before the court, were uttered maliciously and without justification or excuse, but that nevertheless an action could not be maintained. In so holding the court said:

To my mind it is illogical to argue that the protection of privilege ought not to exist for a counsel, who deliberately and maliciously slanders another person. The reason of the rule is, that a counsel, who is not malicious and who is acting bona fide, may not be in danger of having actions brought against him. If the rule of law were otherwise, the most innocent of counsel might be unrighteously harassed with suits, and therefore it is better to make the rule of law so large that an innocent counsel shall never be troubled, although by making it so large counsel are included who have been guilty of malice and misconduct.

*Id.* at 402.

It has been said that no public officer is responsible in a civil suit for a judicial determination, however erroneous it may be, and however malicious the motive which has produced it. A public office is an agency for the state, the duties of which involve in their performance the exercise of some portion of the sovereign power, either great or small. ***The rule of responsibility of a public officer, as held by the courts, is said to be that, if the duty which the***

*official authority imposes upon an officer is a duty to the public, a failure to perform it, or an erroneous performance, is regarded as an injury to the public, and not as one to the individual. It is to be redressed in some form of public prosecution, and not by a private person who conceives himself specially injured.* Cooley on Torts (3d Ed.) vol. 2, p. 756. In *Thibodaux v. Thibodaux,* 46 La.Ann. 1528, 16 So. 450, it is said: *"Officials in the performance of a duty imposed by law cannot be held in damages for acts done strictly within the lines of official duty."*

*Id.* at 403–04 (emphasis added).

The court concluded:

In our opinion the law requires us to hold that a [prosecutor], in the performance of the duties imposed upon him by law, is immune from a civil action for malicious prosecution based on an indictment and prosecution, although it results in a verdict of not guilty rendered by a jury. *The immunity is absolute, and is grounded on principles of public policy. The public interest requires that persons occupying such important positions and so closely identified with the judicial departments of the government should speak and act freely and fearlessly in the discharge of their important official functions. They should be no more liable to private suits for what they say and do in the discharge of their duties than are the judges and jurors, to say nothing of the witnesses who testify in a case.*

*Id.* at 406 (emphasis added).

Judge Learned Hand addressed the issue of a prosecutor's immunity from civil suit in *Gregoire v. Biddle,* 177 F.2d 579 (2d Cir.1949). Armand Gregoire was jailed by federal authorities during the Second World War. Gregoire was suspected of being a German and therefore an enemy of the United States. Gregoire asserted he was French. At a hearing before the Enemy Alien Hearing Board, Gregoire proved his claim. Gregoire, however, remained imprisoned. It was not until after the war that he was released. Gregoire subsequently sued two successive Attorneys General of the United States, two successive Directors of the Enemy Alien Control Unit of the Department of Justice, and the Director of Immigration at Ellis Island for false arrest.

The federal district court found the defendants had unlawfully incarcerated Gregoire and had been induced to do so by "personal ill-will." *Id.* at 579. Nevertheless, the trial court dismissed Gregoire's complaint, finding the defendants possessed an ***absolute immunity*** from personal civil liability. *Id.*

On appeal, the Second Circuit affirmed the district court's disposition. Judge Hand wrote the costs to the public interest and judicial economy were too great to permit a plaintiff alleging injury by a prosecutor to recover damages:

> It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. ***The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.*** Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. ***There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors.*** As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. ***In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.*** Judged as *res nova,* we should not hesitate to follow the path laid down in the books.

*Id.* at 581 (emphasis added).

The court additionally delved into the issue of whether a prosecutor could lose his immunity from personal liability if it

was determined his acts against a plaintiff, while within the scope of his duties and powers, were not exercised in the interest of his constituents. It determined that immunity continues to shield the prosecutor even when his motives for prosecution were less than pure:

> The decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the scope of his powers; and it can be argued that official powers, since they exist only for the public good, never cover occasions where the public good is not their aim, and hence that to exercise a power dishonestly is necessarily to overstep its bounds. A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him. For the foregoing reasons it was proper to dismiss the [claim].

*Id.*

In the modern era, the tenets expounded in *Griffith, Yaselli,* and *Gregoire* have served as a theoretical foundation for judges as they have grappled to develop responses to the novel issues presented by plaintiffs in civil suits against prosecutors.

### B. Application of the Prosecutorial Immunity Doctrine in Cases Arising Under § 1983

In 1871, Congress passed sweeping legislation that today is known as 42 U.S.C.A. § 1983. This section states, in pertinent part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

On its face, § 1983 admits no immunities. *Tower v. Glover,* 467 U.S. 914, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984). However, since its decision in *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), the Supreme Court has consistently recognized that substantive doctrines of privilege and immunity may limit the relief available in § 1983 litigation. *Id.*

In *Tenney,* at issue was the personal liability of legislators under § 1983 [3] for tortious acts resulting from the performance of their official duties. After a comprehensive review of the history of the legislative immunity doctrine, the Court queried:

Did Congress by the general language of its 1871 statute mean to overturn the tradition of legislative freedom achieved in England by Civil War and carefully preserved in the formation of State and National Governments here? Did it mean to subject legislators to civil liability for acts done within the sphere of legislative activity?

*Id.* at 376, 71 S.Ct. at 788.

The Court decided § 1983 did not invalidate the immunity traditionally enjoyed by legislators: "We cannot believe that Congress—itself a staunch advocate of legislative freedom—would impinge on a tradition so well grounded in history and reason by covert inclusion in the general language before us." *Id.*

The *Tenney* holding would help shape the Court's later decisions involving the status of prosecutorial immunity in § 1983 claims. The most important of these decisions is *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). *Imbler* is also the first case decided by the Supreme Court involving the § 1983 liability of a state prosecutor. *Id.* at 420, 96 S.Ct. at 990.

Relying on the holdings of *Griffith v. Slinkard* and *Yaselli v. Goff,* the Court concluded state prosecutors were clothed with immunity. Next came an extensive analysis of whether this shield was in the form of ***qualified or absolute immunity***

---

**3.** At the time of the *Tenney* decision, the language of the current § 1983 was located at 8 U.S.C.A. § 43. Nevertheless, in the interest of clarity and consistency, the above-quoted statutory language is characterized as "§ 1983" throughout this opinion.

under § 1983. The Court determined state prosecutors enjoyed *absolute* immunity:

> If a prosecutor had only a qualified immunity, the threat of § 1983 suits would undermine performance of his duties no less than would the threat of common-law suits for malicious prosecution. A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court. The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages. Such suits could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate. *Cf. Bradley v. Fisher*, 13 Wall., [335] at 348, 20 L.Ed. 646 [ (1871) ]; *Pierson v. Ray*, 386 U.S. [547], at 554, 87 S.Ct. [1213], at 1217 [18 L.Ed.2d 288 (1967) ]. Further, if the prosecutor could be made to answer in court each time such a person charged him with wrongdoing, his energy and attention would be diverted from the pressing duty of enforcing the criminal law.

*Id.* at 424–25, 96 S.Ct. at 992.

Moreover, suits that survived the pleadings would pose substantial danger of liability even to the honest prosecutor. The prosecutor's possible knowledge of a witness' falsehoods, the materiality of evidence not revealed to the defense, the propriety of a closing argument, and—ultimately in every case—the likelihood that prosecutorial misconduct so infected a trial as to deny due process, are typical of issues with which judges struggle in actions for post-trial relief, sometimes to differing conclusions. The presentation of such issues in a § 1983 action often would require a virtual retrial of the criminal offense in a new forum, and the resolution of some technical issues by the lay jury. It is fair to say, we think, that the honest prosecutor would face greater difficulty in meeting the standards of qualified immunity than other executive or administrative officials. Frequently acting under serious constraints of time and even information, a prosecutor inevitably makes many decisions that could engender colorable claims of constitutional deprivation. Defending these decisions, often years after

they were made, could impose unique and intolerable burdens upon a prosecutor responsible annually for hundreds of indictments and trials. *Cf. Bradley v. Fisher, supra*, 13 Wall., at 349, 20 L.Ed. 646.

The affording of only a qualified immunity to the prosecutor also could have an adverse effect upon the functioning of the criminal justice system. Attaining the system's goal of accurately determining guilt or innocence requires that both the prosecution and the defense have wide discretion in the conduct of the trial and the presentation of evidence. The veracity of witnesses in criminal cases frequently is subject to doubt before and after they testify, as is illustrated by the history of this case. If prosecutors were hampered in exercising their judgment as to the use of such witnesses by concern about resulting personal liability, the triers of fact in criminal cases often would be denied relevant evidence.

*Id.* at 425–26, 96 S.Ct. at 992–93 (footnotes omitted).

The opinion included a recitation of the rationale for prosecutorial immunity:

The ultimate fairness of the operation of the system itself could be weakened by subjecting prosecutors to § 1983 liability. Various post-trial procedures are available to determine whether an accused has received a fair trial. These procedures include the remedial powers of the trial judge, appellate review, and state and federal post-conviction collateral remedies. In all of these the attention of the reviewing judge or tribunal is focused primarily on whether there was a fair trial under law. This focus should not be blurred by even the subconscious knowledge that a post-trial decision in favor of the accused might result in the prosecutor's being called upon to respond in damages for his error or mistaken judgment.

. . . .

. . . [Prosecutorial] immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty. *But the alternative of qualifying a prosecutor's immunity would disserve the broader public interest. It would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper*

*functioning of the criminal justice system. Moreover, it often would prejudice defendants in criminal cases by skewing post-conviction judicial decisions that should be made with the sole purpose of insuring justice.*

*Id.* at 427–28, 96 S.Ct. at 993–94 (emphasis added) (footnotes omitted).

Perhaps the greatest legacy of *Imbler* is the Court's defining of the parameters of prosecutorial immunity (*i.e.*, the Court delineated the tasks of a prosecutor that are encompassed within the doctrine's protection):

We agree with the Court of Appeals that [Pachtman's] activities were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force. We have no occasion to consider whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate. We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983.

*Id.* at 430–31, 96 S.Ct. at 995 (emphasis added) (footnotes omitted).

*We recognize that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom.* A prosecuting attorney is required constantly, in the course of his duty as such, to make decisions on a wide variety of sensitive issues. *These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.* At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing a proper line

between these functions may present difficult questions, but this case does not require us to anticipate them.

*Id.* at 431 n. 33, 96 S.Ct. at 995 n. 33 (emphasis added).

Since *Imbler*, the Supreme Court has been presented with several cases that have required it to redefine the boundaries of prosecutorial immunity. The Court's decision in *Burns v. Reed*, 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991), expanded the *Imbler* analysis to matters pertaining to a prosecutor's participation in a probable cause hearing and giving advice to the police regarding permissible investigative tactics:

The prosecutor's actions at issue here—appearing before a judge [at a probable cause hearing] and presenting evidence in support of a motion for a search warrant—clearly involve the prosecutor's "role as advocate for the State," rather than his role as "administrator or investigative officer," the protection for which we reserved judgment in *Imbler, see id.*, at 430–431, and n. 33, 96 S.Ct., at 995, and n. 33. Moreover, since the issuance of a search warrant is unquestionably a judicial act, *see Stump v. Sparkman*, 435 U.S. 349, 363, n. 12, 98 S.Ct. 1099, 1108, n. 12, 55 L.Ed.2d 331 (1978), appearing at a probable-cause hearing is "intimately associated with the judicial phase of the criminal process." *Imbler, supra*, 424 U.S., at 430, 96 S.Ct., at 995. It is also connected with the initiation and conduct of a prosecution. . . .

*Id.* at 491–492, 111 S.Ct. at 1942.

A prosecutor providing legal advice to police regarding proper investigative tactics, however, was not recognized by the Court as prosecutorial in nature:

We do not believe . . . that advising the police in the investigative phase of a criminal case is so "intimately associated with the judicial phase of the criminal process," *Imbler*, 424 U.S., at 430, 96 S.Ct., at 995, that it qualifies for absolute immunity.

*Id.* at 493, 111 S.Ct. at 1943.

In *Buckley v. Fitzsimmons*, 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993), the Court gave direction as to when the activities of a prosecutor prior to his presentation of the case to the grand jury come under the construct of "advocate":

The question, then, is whether the prosecutors have carried their burden of establishing that they were functioning as "advocates" when they were endeavoring to determine whether the bootprint at the scene of the crime had been made by petitioner's foot. A careful examination of the allegations concerning the conduct of the prosecutors during the period before they convened a special grand jury to investigate the crime provides the answer. *See supra,* at 2610, n. 1. The prosecutors do not contend that they had probable cause to arrest petitioner or to initiate judicial proceedings during that period. Their mission at that time was entirely investigative in character. A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested.

. . . .

After *Burns,* it would be anomalous, to say the least, to grant prosecutors only qualified immunity when offering legal advice to police about an unarrested suspect, but then to endow them with absolute immunity when conducting investigative work themselves in order to decide whether a suspect may be arrested. That the prosecutors later called a grand jury to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutorial. A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as "preparation" for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial. When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same.

*Id.* at 274–76, 113 S.Ct. at 2616–17.

Regarding a prosecutor's participation at a press conference, the *Buckley* Court came to the firm conclusion that this act was protected by qualified immunity only:

The functional approach of *Imbler,* which conforms to the common-law theory, leads us to the same conclusion. Comments to the media have no functional tie to the judicial

process just because they are made by a prosecutor. At the press conference, Fitzsimmons did not act in "'his role as advocate for the State,'" *Burns v. Reed,* 500 U.S., at 491, 111 S.Ct., at 1941, quoting *Imbler v. Pachtman,* 424 U.S., at 431, n. 33, 96 S.Ct., at 995, n. 33. The conduct of a press conference does not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions. Statements to the press may be an integral part of a prosecutor's job, *see* National District Attorneys Assn., *National Prosecution Standards* 107, 110 (2d ed.1991), and they may serve a vital public function. But in these respects[,] a prosecutor is in no different position than other executive officials who deal with the press, and, as noted above, *supra,* at 2612–2613, 2617, qualified immunity is the norm for them.

*Id.* at 277–78, 113 S.Ct. at 2618 (emphasis added).

## C. Prosecutorial Immunity and the South Carolina Tort Claims Act

The leading case in South Carolina with regard to a government official's protection from civil suit via immunity and the South Carolina Tort Claims Act[4] is *O'Laughlin v. Windham,* 330 S.C. 379, 498 S.E.2d 689 (Ct.App.1998). In *O'Laughlin,* this Court held the doctrines of immunity created within the common law were not supplanted by the Tort Claims Act:

The Tort Claims Act expressly preserves all existing common law immunities. The Act was adopted to ensure "that the State, and its political subdivisions are only liable for torts within the limitations of this chapter and in accordance with the principles established herein." S.C.Code Ann. § 15–78–20(a) (Supp.1997). It states:

*The General Assembly additionally intends to provide for liability on the part of the State, its political subdivisions, and employees, while acting within the scope of official duty, only to the extent provided herein. All other immunities applicable to a governmental entity, its employees, and agents are expressly preserved.*

---

4. S.C.Code Ann. §§ 15–78–10 to –200 (Supp.2000).

S.C.Code Ann. § 15–78–20(b) (Supp.1997) (emphasis added). Therefore, the Act itself expressly preserves common law judicial immunity.

A strong presumption also exists that the General Assembly does not intend to supplant common law principles when enacting legislation. *Hoogenboom v. City of Beaufort*, 315 S.C. 306, 433 S.E.2d 875 (Ct.App.1992). *See also Frost v. Geernaert*, 200 Cal.App.3d 1104, 246 Cal.Rptr. 440, 442 (1988) (holding that common law judicial immunity survived the adoption of the California Tort Claims Act, stating, "statutes should not be interpreted to alter the common law unless it is expressly provided they should do so; there is a presumption that a statute, does not, by implication, repeal the common law.").

. . . .

... [T]he South Carolina Supreme Court's holding in *Fleming v. Asbill*[5] is instructive in determining the effect of the adoption of the Tort Claims Act. *Id.* In *Fleming*, the Court found that a guardian ad litem, while not an employee under the Tort Claims Act, was entitled to common law quasi-judicial immunity. *Id.* In so finding, the Court implicitly recognized that the common law principles of judicial immunity, in some form, survive the adoption of the Tort Claims Act.

Based on the statutory language of the Tort Claims Act, the presumption of legislative intent to preserve common law principles, policy considerations, and the Supreme Court's holding in *Fleming*, we find that absolute judicial immunity, defined by common law, survives the adoption of the Tort Claims Act.

*Id.* at 383–85, 498 S.E.2d at 691–692 (italics in original) (emphasis added).

■ Prosecutorial immunity, like judicial immunity, is a common law principle. In light of this Court's holding in *O'Laughlin*, the Tort Claims Act should not be interpreted as displacing the protections guaranteed by the prosecutorial immunity doctrine.

---

5. 326 S.C. 49, 483 S.E.2d 751 (1997).

## II. Civil Suits Against Prosecutors in Their Official Capacity

### A. Section 1983 Suits

A § 1983 suit for damages cannot be brought against a government official in his official capacity, as recently explained by the Maryland Court of Appeals in *Okwa v. Harper*, 360 Md. 161, 757 A.2d 118 (2000):

> Section 1983 permits a plaintiff to recover damages when an individual, acting under the color of state law, transgresses a federally created right of the plaintiff. *See Howlett By and Through Howlett v. Rose*, 496 U.S. 356, 358, 110 S.Ct. 2430, 2433, 110 L.Ed.2d 332, 342 (1990). The text of the statute and cases analyzing § 1983 actions dictate that a defendant in a § 1983 action must. be a "person." *See Ashton [v. Brown]*, 339 Md. at 110, 660 A.2d at 466; *Ritchie v. Donnelly*, 324 Md. 344, 354, 597 A.2d 432, 437 (1991) and cases cited therein). A state public official, sued in his or her official capacity, is not considered a "person" when a plaintiff brings a § 1983 action for monetary damages. The purpose behind placing state officials sued in their official capacities out of range of a § 1983 claim is that such a suit, in essence, is a suit against the state, which is not a permissible defendant in a § 1983 action. *See Howlett By and Through Howlett*, 496 U.S. at 365, 110 S.Ct. at 2437, 110 L.Ed.2d at 346. If the plaintiff prevails, the state treasury, not the state official personally, will be responsible for paying the assessed damages. *See DiPino [v. Davis]*, 354 Md. at 46, 729 A.2d at 369; *Ritchie*, 324 Md. at 359–60, 597 A.2d at 439.

*Id.* at 135 (footnote omitted); *see also, e.g., Will v. Michigan Dep't of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that neither the state nor its officials acting in their official capacities are "persons" under § 1983, and therefore are not subject to suit under the statute in either federal or state court, except insofar as they are sued for prospective injunctive relief).

### B. Tort Claims Act Suits

In 1985, our Supreme Court decided *McCall v. Batson*, 285 S.C. 243, 329 S.E.2d 741. This case is significant because the

Court largely abolished the doctrine of sovereign immunity. Certain exceptions to this holding, however, were carved out:

> [T]he abrogation of the rule will not extend to legislative, judicial and executive acts by individuals acting in their official capacity. These discretionary activities cannot be controlled by threat of tort liability by members of the public who take issue with the decisions made by public officials. We expressly decline to allow tort liability for these discretionary acts. The exercise of discretion includes the right to be wrong.

*Id.* at 246, 329 S.E.2d at 742.

When the General Assembly enacted the Tort Claims Act, it codified the *McCall* exceptions. *See* S.C.Code Ann. § 15–78–60(1)(2) (Supp.2000) (stating "The governmental entity is not liable for a loss resulting from (1) legislative, judicial, or quasi-judicial action or inaction; and (2) administrative action or inaction of a legislative, judicial, or quasi-judicial nature").

 The duties of a prosecutor fall into the exceptions enumerated by *McCall* and § 15–78–60. The case law cited throughout this opinion clearly supports the proposition that a prosecutor's typical duties are "judicial" or "quasi-judicial" in nature. Accordingly, this Court finds a prosecutor, in his official capacity, is immune from a Tort Claims Act suit involving "judicial" or "quasi-judicial" acts, provided a defendant prosecutor raises the affirmative defense of sovereign immunity in his return. *See Tanner v. Florence City–County Bldg. Comm'n,* 333 S.C. 549, 511 S.E.2d 369 (Ct.App.1999) (holding sovereign immunity is an affirmative defense that must be pled).

### III. Application of the Law to the Instant Case

 *Imbler* and its progeny identified those tasks or operations by a prosecutor that are absolutely immunized from civil litigation. Close examination of the record does not reveal any conduct by Condon or Giese that deviates from these protected duties. In the absence of proof, the Circuit Court correctly dismissed the claims brought against Condon and Giese in their individual capacities. *See Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *abrogated on other grounds by Harlow v. Fitzgerald,* 457 U.S.

800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (recognizing that where a complaint articulates a § 1983 claim that is unquestionably protected by absolute immunity, the further development of facts is unnecessary and the trial court may dismiss the suit).

Furthermore, the *O'Laughlin* Court clearly stated that the provisions of the Tort Claims Act do not supplant common law immunity doctrines. Prosecutorial immunity is a common law immunity doctrine. Accordingly, we find that the Circuit Court properly dismissed the claims Williams instituted pursuant to this act against the prosecutors in their individual capacities.

Finally, the claims raised against Condon and Giese in their official capacities were impermissible. Section 1983 does not allow plaintiffs to initiate suits for damages against government officials in their official capacities. As well, because no proof exists that refutes the notion that Giese's or Condon's actions against Williams were "judicial" or "quasi-judicial" in scope, no cause of action brought under the Tort Claims Act can be allowed to proceed against either defendant in his official capacity.

## CONCLUSION

We hold a prosecutor in the employ of this state is immune from personal liability under § 1983 or the South Carolina Tort Claims Act for actions relating to the prosecution of an individual as a criminal defendant—regardless of the prosecutor's motivation—provided the actions complained of were committed while the prosecutor was acting as an *"advocate,"* as defined by *Imbler v. Pachtman* and its progeny.

Additionally, the law is clear that a prosecutor cannot be sued in his official capacity under either § 1983 for money damages or the Tort Claims Act when the acts complained of were "judicial" or "quasi-judicial" in nature.

For the foregoing reasons, the decision of the Circuit Court is

**AFFIRMED.**

HOWARD, J., concurs.

SHULER, J., dissents in a separate opinion.

SHULER, J., dissenting:

Because I believe this Court does not have subject matter jurisdiction to hear Williams' appeal, I respectfully dissent.

Williams filed the instant action on August 11, 1999, and Respondents subsequently filed a 12(b)(6) motion to dismiss. The trial court granted the motion on May 25, 2000. On June 5, Williams filed a post-trial motion asking the court to vacate the dismissal, claiming it came "as a complete surprise" that "must have been a clerical oversight or mistake" in light of his outstanding motion to compel discovery. In a form order dated June 22, the trial court denied the motion. Williams served notice of this appeal on July 7, 2000.

Under our rules of appellate procedure, a party's notice of appeal must be served within thirty days "after receipt of written notice of entry of the order or judgment." Rule 203(b)(1), SCACR. However, when a party makes a timely motion for j.n.o.v., to alter or amend the judgment, or for a new trial, "the time for appeal for all parties shall be stayed and shall run from receipt of written notice of entry of the order granting or denying such motion." *Id.; see Canal Ins. Co. v. Caldwell,* 338 S.C. 1, 524 S.E.2d 416 (Ct.App.1999).

On the other hand, motions made pursuant to Rule 60, SCRCP do not affect the finality of the judgment under attack and thus do not toll the time for appeal. *See Otten v. Otten,* 287 S.C. 166, 337 S.E.2d 207 (1985); *Coward Hund Constr. Co., Inc. v. Ball Corp.,* 336 S.C. 1, 518 S.E.2d 56 (Ct.App.1999); *see also,* James F. Flanagan, *South Carolina Civil Procedure* (2d ed.1996). Accordingly, because a Rule 60 motion does not have the tolling effect of other post-trial motions under Rules 50 and 59, SCRCP, the time for appeal "continues to run from the entry of the judgment" that the motion challenges. *Coward Hund,* 336 S.C. at 6, 518 S.E.2d at 59 (quoting 12 James W. Moore et al., *Moore's Federal Practice* ¶ 59.11[4][b] (3d ed.1999)).

Although the title of Williams' motion to vacate the trial court's order cited both Rule 59 and Rule 60, the language and

substance of the motion indicate Williams sought relief pursuant to Rule 60(a) and (b)(1), SCRCP. In particular, the motion stated: "The Plaintiff is informed and reasonably believes this Court should vacate the dismissal Order due to the Plaintiff's outstanding Motion to compel the Defendants' appearance for depositions, because the issuance of this Order must have been a *clerical oversight or mistake by the court.*" (emphasis added). Williams, therefore, did not ask the court to alter or amend the judgment based upon a legal or factual error in its order; rather, he requested relief because his motion to compel discovery was still pending.

A fair reading of Williams' motion to vacate clearly shows he relied solely on Rule 60 in averring the trial court committed a "mistake" in overlooking his outstanding motion to compel. In my view, as the body of the motion is squarely within the purview of Rule 60 only, we must treat it as such for purposes of this appeal regardless of the titular reference to Rule 59. *See Mickle v. Blackmon,* 255 S.C. 136, 140, 177 S.E.2d 548, 549 (1970) (treating motion based on its "substance and effect" as opposed to how it was styled by plaintiff); *Standard Fed. Sav. & Loan Ass'n v. Mungo,* 306 S.C. 22, 26, 410 S.E.2d 18, 20 (Ct.App.1991) (stating that it is the substance of the relief sought that matters "regardless of the form in which the request for relief was framed").

The trial court issued its order dismissing Williams' suit on May 25, 2000 and Williams admits the post office forwarded the order to him on May 30. Since a motion under Rule 60, SCRCP does not toll the time for appeal, Williams was required to serve his notice of appeal no later than June 29, 2000. Williams, however, served notice of this appeal on July 7, 2000; as a result, his appeal is untimely. Because timely service of a notice of appeal is a prerequisite to jurisdiction, I would find this Court lacks subject matter jurisdiction to entertain Williams' appeal and dismiss. *See Canal,* 338 S.C. at 5, 524 S.E.2d at 418 ("Rule 203(b), SCACR, requires a party to serve his notice of appeal within thirty days after receiving written notice of the entry of a final order or judgment, and failure to do so divests this court of subject matter jurisdiction and results in dismissal of the appeal.").[6]

---

**6.** Although Williams asserts he "timely" filed his notice of appeal on July 8, 2000, it is the *service* of an appellant's notice of appeal that must

---

be timely. In any event, as the timeliness of an appeal involves a
question of subject matter jurisdiction, it is the duty of this Court to
ascertain that an appeal is timely regardless of the parties' assertions.