NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0531n.06

No. 13-2033

**FILED**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

JUL 21 2014

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ROBERT KING, | ) | |
| | ) | |
| Plaintiff - Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| WADE MCCREE, | ) | |
| | ) | |
| Defendant - Appellee. | ) | |

**Before: BOGGS, COLE, and McKEAGUE, Circuit Judges.**

BOGGS, J., delivered the opinion of the court, in which COLE and McKEAGUE, JJ., joined. COLE, J., delivered a separate concurrence, in which McKEAGUE, J., joined.

**BOGGS, Circuit Judge.** Judge Wade McCree, while serving as the presiding judge in a felony child-support case against Robert King, maintained a romantic and sexual relationship with the complaining witness against King. In part as a result of this conduct, the Michigan Supreme Court both removed Judge McCree from judicial office and prospectively suspended him without pay for six years if voters should reelect Judge McCree in November 2014. King sued Judge McCree under 42 U.S.C. § 1983, alleging that Judge McCree's conduct surrounding his case violated his right to due process of law. The district court determined that Judge McCree is immune from suit under the doctrine of judicial immunity. Because any violation of King's constitutional rights arose purely from Judge McCree's judicial actions, we affirm.

1

I

A. The First Encounter

In January 2012, Judge Wade McCree was a judge on the Third Judicial Circuit Court in Wayne County, Michigan. Robert King and Geniene La'Shay Mott were the unmarried parents of a five-year-old girl.

On March 12, 2012, the court issued a felony warrant for King's arrest for failing to pay child support, in violation of Mich. Comp. Laws § 750.165. On March 21, 2012, the state arraigned King before Magistrate Renee R. McDuffee, and the court entered a plea of not guilty. The court then transferred King's case to Judge McCree.

On March 28, 2012, Judge McCree held a hearing in King's case, consisting of an arraignment on an information and a preliminary examination. King waived the preliminary examination.

Two months later, on May 21, 2012, Judge McCree conducted a pre-trial hearing in *People v. King*, No. 12-003141-01-FH. Mott, the custodial parent in the state's child-support case against King, was present. King owed Mott $280.50 per month in support, and he owed Mott over $10,000 in total.[1] At the hearing, the state learned that King had made a $400 payment on his arrears that day. Consequently, the court and the parties agreed to a "delayed sentence" in which King agreed to a stipulated payment plan.

During this hearing, Judge McCree met Mott for the first time. As the prosecutor prepared the child-support payment agreement, Judge McCree told Mott: "Ma'am you've been so patient all day and you know, having all this time with my deputy here, let me get a little of it." Judge McCree then asked Mott about her daughter's age and school. Mott told Judge

---

[1] At one point, the prosecutor listed the total as $15,000. At another point, the prosecutor listed the total as "[j]ust shy of" $12,000.

2

McCree that she had gone years without receiving much payment. Mott told Judge McCree that "[i]f [King] don't have court dates he doesn't pay. If we have to go to court he magically always has the money."

King pleaded guilty to failure to pay child support. Judge McCree entered the delayed sentence, pursuant to Mich. Comp. Laws § 771.1(2), under which the court would withdraw the plea and dismiss the charges if King made his payments for eleven months. Judge McCree scheduled the case for review hearings on August 16 and November 15, 2012.

## B. The Spark

The Michigan Judicial Tenure Commission (JTC) ultimately filed a complaint against Judge McCree based on his conduct surrounding *People v. King*. At a hearing before the JTC a year later, Judge McCree recalled what transpired after King's pre-trial hearing ended and court adjourned on March 28, 2012.

"Well, the courtroom had now pretty much cleared," Judge McCree said. "There weren't a half dozen people left in the courtroom[,] and she was chatting with my deputies and so forth[,] and I'm still on the bench doing my paper shuffle. And she's making conversation, and we're all involved in it. Making light conversation. Everybody is into it."

Judge McCree acknowledged that this was not "standard practice." "But," he said, "I confess she was an attractive, striking woman, and, you know, she caught my eye." The JTC examiner asked Judge McCree if he "c[a]me on to her at that point." "Oh, we chatted, sure," Judge McCree said. "As you can probably tell, I'm a bit animated. I'm a rather effervescent personality, and sure, we chatted."

3

Judge McCree's courtroom deputy dropped Mott's card on Judge McCree's bench, and Judge McCree may have given Mott his business card as well. Judge McCree could not recall giving Mott his business card, but he acknowledged that it was "quite likely" that he did so.

Judge McCree later described his meeting Mott in a text message to her. It said: "Girl, every man in the damn courtroom was peeping your upscale game." Judge McCree stated that "everyone" referred, in part, to himself. The message also said: "C'mon, U'r talking about the 'docket from hell,' filled w/tatted up, overweight, half-ass English speaking, gap tooth skank hoes ... and then you walk in." (ellipsis in original). It concluded: "Had Jewell not been [there] that day, I'd have asked Deputy Green to escort you back into chambers so I would be [sic] so obvious giving you my biz card." Judge McCree stated that he sent the message in order to flatter Mott and that he did not intend to demean any litigant who had appeared before him.

Judge McCree testified before the JTC that Mott called his chambers a day or two later. As Judge McCree recalled: "I returned the call to her[,] and we chatted, and she was talkative. She was interesting, and she said, [']Can we get together?['] I said sure. I don't have – I don't see why not." The two made lunch plans for a week later.

On May 30, 2012, Judge McCree and Mott had lunch together in Detroit's Eastern Market area, just east of downtown. The two "hit it off." Mott "had a very interesting lifestyle," Judge McCree testified. "She was -- she loved sports and knew sports. She was not someone who just feigned an interest." They also discussed Mott's work. Mott "claimed to have been in public relations and media consulting work, and obviously a whole lot more, as it did involve intimate – that did involve intimate . . . relations."

4

Judge McCree knew that Mott was involved in a pending case before him when he made plans with her. Judge McCree said that on both May 21 and on May 30 it did not "dawn on [him]" to transfer King's case.

## C. A "Volatile" Relationship

According to Judge McCree, after lunch, on May 30, 2012, Mott texted Judge McCree, telling him that she would like to see him. Judge McCree responded, telling Mott that they should coordinate their "calendars together."

In June 2012, Judge McCree and Mott began a romantic, sexual relationship. At his JTC hearing, Judge McCree described the relationship as "volatile." "Ms. Mott is passionate," Judge McCree stated. "She would be at the apex of euphoria. She'd be at the abyss of near homicidal anger." As Judge McCree recalled, "[A]fter the romance began, I found out that I had to do a lot of things just to pacify her. I had to tell her things she needed to hear to pacify her."

In the course of their relationship, Judge McCree loaned Mott money. Judge McCree estimates that he gave Mott about $6,000. "Her big time is the NBA season, which, of course, kicks up November, December and then runs through the winter and early spring," Judge McCree said. "She was coming into this sum of money. And Wade, if I could just get, you know – just to tide me over."

Judge McCree acknowledged that, on a few occasions, their trysts took place in his chambers. Judge McCree occasionally escorted Mott through the courthouse's back entrance and into his chambers. Judge McCree acknowledged texting Mott while he was on the bench but denied doing so while court was in session or while he was on the record.

Judge McCree asked Mott to remain discreet about their relationship. He stated that he "obviously made these requests because he was concerned about his wife and family discovering

5

their relationship." On June 20, 2012, Judge McCree allegedly e-mailed Mott: "My Judicial Tenure Commission matter has me nervous, as you might expect. I have to be **real** careful until this matter is put to rest. I can only ask humbly for your indulgence. Sorry." The e-mail also allegedly said: "Second, you are the complaining witness in a case that is before me. Naturally if it got out that we were seeing each other before your B.D.'s [presumably, "baby daddy's"] case close, everybody could be in deep shit."

### D. The August 16, 2012, Review Hearing

Judge McCree acknowledged that, during his relationship with Mott, they "probably" discussed whether King was in compliance with the delayed-sentence agreement. King was scheduled for an August 16, 2012, review hearing before Judge McCree. Judge McCree acknowledged that in the days prior to the hearing, he and Mott exchanged text messages about King's hearing and the potential actions that Judge McCree could take if King were not in compliance with the agreement. Mott allegedly suggested that Judge McCree impose a jail sentence for King unless King paid $2,500 in cash. Judge McCree allegedly responded in a text message: "I figured if he hasn't come current by his courtdate, he gets jail 2 pay. If he says he can bring me the $$, I'll put him on a tether till he brings the receipt 2 FOC [presumably, "friend of court"] or do 'double time'."

According to Judge McCree, he advised Mott that he could not order King to pay more than the consent order required or pay any quicker than the order required. Judge McCree acknowledged that he told Mott that he could send King to jail or place him on a tether until King made payments. These were statements, Judge McCree said, that he made to other complaining witnesses in felony child-support cases. Prior to the August 16 hearing, Mott informed Judge McCree that King was behind on his child-support payments.

6

On August 12, 2012, Judge McCree and Mott allegedly exchanged additional text messages about King's upcoming review hearing. In these messages, Mott suggested that King pay more than what was required under the delayed-sentence order. Judge McCree states that he again told Mott that he could not require King to pay more.

On August 16, 2012, the date of King's review hearing, Judge McCree assisted Mott in bringing her cell phone into the courtroom, in violation of courthouse policy. At the hearing, the prosecutor informed Judge McCree that King was $672 short of compliance with the delayed-sentence agreement. King told the court that he had been working as a manager of a bar in Pontiac, Michigan but that assailants robbed him of $2,000 and shot and killed two of his friends. Judge McCree permitted King to pay the money that was owed by the end of the month. Judge McCree also placed King on a "tether" in order to monitor his whereabouts. Judge McCree also advised that the court could remove the tether as soon as King paid what he owed. He stated: "[W]hen $672 o[f] that is paid I'll certainly take the tether off." If King did not pay the money by that time, Judge McCree informed King that he would consider withdrawing the delayed-sentence agreement and imposing a felony conviction. Judge McCree scheduled an additional review hearing for August 29. King alleges that, immediately after the August 16 hearing, Judge McCree and Mott had sex in Judge McCree's chambers.

E. Judge McCree Transfers King's Case

At some point after the August 16 hearing, Judge McCree decided that he needed to transfer King's case to another judge. On September 19, 2012, around 8:46 a.m., Judge McCree allegedly texted Mott: "Running upstairs 2 C if Judge Callahan will 'take' Brother King's case. I'll B N touch w/a quickness:-)" Judge McCree acknowledged that he told the assistant attorney general that he was transferring the case because his son and Mott's son attended a social event

7

together, which, he says, was a true statement because the boys attended a football game "together" at Wayne State University. Judge McCree allegedly told the same information to Chief Judge Timothy Kenney. Judge McCree did not disclose his personal relationship with Mott. Around 9:48 a.m., Judge McCree allegedly texted Mott: "DONE DEAL!!!:-). I told a story so well, I had me believing it!! Brother King is on his way 2 'hangin' Judge Callahan. He fuck up ONCE & he's through!!" That day, Judge McCree entered an order transferring King's case to Judge Callahan.

The court scheduled King for a November 15, 2012, review hearing before Judge Callahan. The clerk noted on King's docket sheet that the assistant attorney general informed the court that King was in compliance with the agreement. The court delayed the review hearing at the prosecutor's request.

On November 15, the day of King's scheduled hearing, Mott allegedly texted King asking why King's hearing before Judge Callahan did not occur. Judge McCree stated that he did not respond. Judge McCree allegedly told Mott he would ask the prosecutor why King's hearing was delayed. Judge McCree stated that he did not recall speaking with the prosecutor about the November 15 hearing.

### F. Denouement

Around October 31, 2012, Judge McCree told Mott that he wished to end their relationship. Mott informed Judge McCree that she was pregnant with his child.

At one point, Mott confronted Judge McCree at his house, causing Judge McCree's wife to contact the police. Mott also confronted Judge McCree during an afternoon in Detroit's Belle Isle park. Additionally, Judge McCree stated that Mott confronted him in the courthouse parking

8

lot, demanding money and his time. Judge McCree also stated that Mott attempted to contact him on his daughter's cell phone.

Consequently, on November 20, 2012, Judge McCree filed a stalking and extortion complaint against Mott with the Wayne County Prosecutor's Office. Judge McCree stated that he told the prosecutor's office that he had a relationship with Mott and that he transferred the case to Judge Callahan. Judge McCree also stated that he told the prosecutor's office that Mott demanded money from him in exchange for an abortion and silence about their relationship.

On December 6, 2012, Mott disclosed the details of her relationship with Judge McCree to a local television reporter. That day, a local television station broadcast a report about Judge McCree's relationship with Mott.

## G. Aftermath

On March 12, 2013, the Michigan JTC filed a formal complaint against Judge McCree based, in part, on his conduct relating to *People v. King. See In re Judge McCree*, Formal Compl. No. 93 (Mich. Jud. Tenure Comm'n Mar. 12, 2013), *available at* http://jtc.courts.mi.gov/downloads/FC93.complaint.pdf. Judge McCree acknowledged that his failure to recuse himself from King's case after beginning a relationship with Mott constituted "misconduct in office," in violation of both Mich. Const, art. 6, § 30(2), and Michigan Court Rule 9.205, providing standards for judicial conduct. Judge McCree denied that his relationship with Mott impacted his handling of the King case in any way. Michigan disciplinary rules provide that "conduct that violates the standards or rules of professional conduct adopted by the Supreme Court" constitutes "grounds for discipline." Mich. Ct. R. 9.104(4). Judge McCree acknowledged that he "likely violated" this rule when he conducted King's August 16, 2012, review hearing. Judge McCree further acknowledged that he violated the standards of judicial

9

conduct. Additionally, Judge McCree acknowledged that he violated Canon 3C of Michigan's Code of Judicial Conduct when he did not disqualify himself from King's case before August 16.

After investigation, the Judicial Tenure Commission recommended that that the Michigan Supreme Court remove Judge McCree from office. *In re Judge McCree*, 845 N.W.2d 458, 459 (Mich. 2014). Judge McCree petitioned the Michigan Supreme Court to reject the JTC's recommendation on the ground that his failure to recuse himself resulted in "no harm no foul." *Id.* at 460. The Michigan Supreme Court determined that Judge McCree's conduct resulted in harm to the "parties' rights to a fair legal process and to the public's right to an impartial judiciary." *Ibid.* The court affirmed the JTC's factual findings and adopted its recommendation. *Id.* at 459. The Michigan Supreme Court removed Judge McCree from office and conditionally suspended him without pay for six years, with the suspension becoming effective only if voters reelect Judge McCree to judicial office in November 2014. *Id.* at 459–60. The court also ordered Judge McCree to pay the JTC $11,645.17 in costs. *Id.* at 460.

The Michigan Supreme Court's published opinion discusses in great detail Judge McCree's relationship with Mott. We limit our description of the facts here to those relevant to King's case. Relevant here, the Michigan Supreme Court found that Judge McCree:

> had an affair with a complaining witness in a case pending before him, had numerous ex parte communications with that witness about the case, extended to her special treatment concerning the case, and caused her reasonably to believe that she was influencing how he was handling her case. When their relationship subsequently went sour, he sought to employ the prosecutor attorney's office as leverage against her by concocting charges of stalking and extortion.

*Id.* at 476.

## H. Current Litigation

On February 11, 2013, King sued Judge McCree and Mott in federal court. King sued Judge McCree under 42 U.S.C. § 1983, alleging that Judge McCree violated his due-process

rights, in violation of the Fifth and Fourteenth Amendments. In a separate count, King alleged, under § 1983 and § 1985, that Judge McCree and Mott conspired to violate his due-process rights.

The district court granted Judge McCree's motion to dismiss. *See King v. McCree*, No. 13-10567, 2013 WL 3878739, at *6 (E.D. Mich. July 26, 2013). The district court recognized judicial immunity for Judge McCree from a civil lawsuit arising out of his judicial actions. *Id.* at *5. The court determined that immunity also extended to King's § 1983 conspiracy count against Judge McCree. *Ibid.* The court also found that King's claim, to the extent based on § 1985, failed to state a claim because it was not plausibly based on class-based animus. *Ibid.* The court permitted the § 1983 conspiracy claim to proceed against Mott. *Id.* at *5 n.2.

On August 1, 2013, King appealed the district court's order dismissing the case against Judge McCree. At that time, King's case against Mott remained pending. On August 13, 2013, we directed King to show cause why we should not dismiss his appeal for lack of jurisdiction. On August 14, 2013, the district court accepted King's and Mott's stipulated order and dismissed the case against Mott without prejudice. On September 4, 2013, we withdrew the show-cause order and ordered that the appeal proceed on the merits.[2]

---

[2] McCree argues that we lack appellate jurisdiction. *See* Appellee Br. x–xiii. We previously held that the district court's August 14, 2013, order resolved all pending claims and rendered the July 26, 2013, order final and appealable. Order, *King v. McCree*, No. 13-2033 (6th Cir. Sept. 4, 2013), ECF No. 22. King moved for reconsideration of our order withdrawing the show-cause order, and a three-judge panel denied King's motion. Order, *King v. McCree*, No. 13-2033 (6th Cir. Nov. 6, 2013), ECF No. 54.

"[T]he law-of-the-case doctrine . . . expresses the practice of courts generally to refuse to reopen what has been decided." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (internal quotation marks omitted). We retain the power to revisit prior decisions, "although as a rule [we] should be loathe [sic] to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Ibid.* (internal quotation marks omitted). McCree has not demonstrated that extraordinary circumstances merit revisiting our prior rulings.

11

II

We review de novo a district court's determination about judicial immunity. *See Bright v. Gallia Cnty., Ohio*, -- F.3d --, Nos. 13-3451 & 13-3907, 2014 WL 2457629, at *4 (6th Cir. June 3, 2014). Judge McCree, as the party claiming judicial immunity, bears the burden of establishing that judicial immunity is proper. *See ibid.* (citing *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 432 (1993)).

III

A

Section 1983 provides a federal cause of action against state officials for the deprivation of constitutional rights under color of state law. 42 U.S.C. § 1983. Similarly, § 1985 provides a federal cause of action against persons who conspire to deprive an individual of "equal protection of the laws" or of "equal privileges immunities under the laws." 42 U.S.C. § 1985(3). Here, King alleges that Judge McCree violated his Fifth and Fourteenth Amendment due-process right and that Judge McCree conspired with Mott to do so.

At common law, judges received immunity from liability for damages for acts committed within their "judicial jurisdiction." *Pierson v. Ray*, 386 U.S. 547, 554 (1967). The Supreme Court formally adopted the doctrine in 1871. *Bradley v. Fisher*, 80 U.S. 335 (1871).[3] That year,

---

[3] This fascinating case concerns the aftermath of the assassination of President Lincoln.

In June 1867, the government tried John H. Suratt in District of Columbia criminal court for Lincoln's murder. *Bradley v. Fisher*, 80 U.S. 335, 344 (1871). At trial, Suratt was represented by attorney Joseph Habersham Bradley, and George P. Fisher was the presiding "justice." *Ibid.* Fisher claimed that one day after recessing court, he was descending from the bench when Bradley "accosted [him] in a rude and insulting manner," "charging [Fisher] with having offered [Bradley] a series of insults from the bench from the commencement of the trial." *Ibid.* According to Fisher's account, he "disclaimed any intention of passing any insult whatever" and "assured [Bradley] that he entertained for him no other feelings than those of respect" but that Bradley "so far from accepting this explanation," "threatened [Fisher] with

12

the Court held that "it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Id.* at 347. "If civil actions could be maintained . . . against the judge, because the losing party should see fit to allege in his complaint that the acts of the judge were done with partiality, or maliciously, or corruptly, the protection essential to judicial independence would be entirely swept away." *Id.* at 348. The Supreme Court made clear the proper penalty for judges who act "with partiality, or maliciously, or corruptly, or arbitrarily, or oppressively" "in the exercise of the powers with which they are clothed as ministers of justice:" such judges "may be called to an account by impeachment and suspended or removed from office." *Id.* at 350.

The doctrine of judicial immunity exists "not for the protection or benefit of a malicious or corrupt judge" but for "the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequence." *Pierson*, 386 U.S. at 554. Section 1983, enacted in 1871, did not abolish judicial immunity. *Ibid.*; see *Stump v. Sparkman*, 435 U.S. 349, 356 (1978) ("[J]udicial immunity . . . appli[es] in suits under § 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983.") [4]

The Court has clarified that judicial immunity is immunity not just from the ultimate assessment of damages but is immunity from suit itself. *Mireles v. Waco*, 502 U.S. 9, 11 (1991) (per curiam). A plaintiff may overcome judicial immunity in only two circumstances. *Ibid.*

---

personal chastisement." *Ibid.* Fisher then entered an order barring Bradley from practicing before that court. *Ibid.*

Bradley complained against Fisher. The United States Supreme Court held that Fisher's removal of Bradley from the bar could not provide the basis for action against Fisher. *Id.* at 356. The Court determined that Fisher could not be liable for damages for his judicial act. *Id.* at 357.

[4] President Grant signed into law the bill containing § 1983 on April 20, 1871. The Supreme Court decided *Bradley* on December 1, 1871. Even aside from the Court's express holding in *Pierson*, that alone might suggest that the passage of § 1983 did not abolish judicial immunity.

Relevant here is the exception for "nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity." *Ibid.*[5] "[T]he proposition that judicial immunity extends only to liability for 'judicial acts' was emphasized no less than seven times in Mr. Justice Field's opinion for the Court in the *Bradley* case." *Stump*, 435 U.S. at 365 (Stewart, J., dissenting). Two factors determine whether an act is a "judicial" one: "the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge" and also "the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." *Stump*, 435 U.S. at 362 (majority opinion). Courts must "look to the particular act's relation to a general function normally performed by a judge." *Mireles*, 502 U.S. at 288. Under this "functional approach," "immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches." *Forrester v. White*, 484 U.S. 219, 224, 227 (1988).

The Supreme Court has offered several examples of acts that are "judicial" within the meaning of its judicial-immunity doctrine. These include: entering an order striking an attorney's name from the roll of attorneys entitled to practice before the bar, *Bradley*, 80 U.S. at 356–57; adjudging parties guilty when their cases are before a judge's court, *Pierson*, 386 U.S. at 553; and approving petitions relating to the affairs of minors, *Stump*, U.S. at 362. In *Mireles*, a state public defender alleged that after he failed to appear for the initial call of a judge's morning calendar, the judge "ordered police officers 'to forcibly and with excessive force seize and bring plaintiff into his courtroom.'" *Mireles*, 502 U.S. at 10 (quoting certiorari petition). The Ninth

---

[5] The second exception is for actions "taken in the complete absence of all jurisdiction." *Mireles*, 502 U.S. at 12. We recently considered the scope and nature of this exception. *See Bright v. Gallia Cnty., Ohio*, -- F.3d --, Nos. 13-3451 & 13-3907, 2014 WL 2457629, at *6–8 (6th Cir. June 3, 2014). It was also the subject of our decision in *Stern v. Mascio*, 262 F.3d 600 (6th Cir. 2001).

Here, King does not argue that McCree's actions were taken in the absence of all jurisdiction.

14

Circuit denied immunity for the judge on the ground that authorizing the use of excessive force is not a judicial act. *Id.* at 11. With neither briefing nor argument, the Supreme Court summarily reversed, holding that ordering court officers to bring a person before a judge is a judicial act. *Id.* at 12.[6]

On the other hand, the Court has held that the act of demoting and discharging a court employee, along with other acts "involved in supervising court employees and overseeing the efficient operation of a court," is not a "judicial" one. *Forrester v. White*, 484 U.S. 219, 229 (1988). Judges who perform these acts do so in an "administrative capacity" only. *Ibid.*

## B

### 1

King complains of multiple acts taken by Judge McCree. If these acts are "judicial," then Judge McCree is immune from suit under the doctrine of judicial immunity. *See Stump*, 435 U.S. at 359. In deciding whether Judge McCree's actions are judicial, we look to both "the nature of the act itself" and "the expectations of the parties." *See id.* at 362.

The district court correctly identified three actions taken by Judge McCree that involved King directly. These are: Judge McCree accepting King's guilty plea and entering the delayed-sentence agreement on May 21, 2012; Judge McCree extending King additional time to pay the money that was owed and Judge McCree placing King on a "tether" on August 16, 2012; and Judge McCree transferring the case to "hangin" Judge Callahan on September 18, 2012.

As for the May 21 actions, at the time Judge McCree accepted King's plea and entered the delayed-sentence agreement, Judge McCree had not begun his relationship with Mott. The

---

[6] Justice Stevens dissented on the merits. *See Mireles*, 502 U.S. at 14. Justices Scalia and Kennedy dissented from the decision granting certiorari and also from the decision to decide the case without briefing and argument. *See id.* at 15.

15

May 21 actions, then, likely did not deprive King of due process. Additionally, as for the September 18 actions, Judge McCree's act of transferring the case to another judge was certainly improper insofar as he did not do so sooner and may have been improper insofar as he intentionally transferred the case to a judge whom he believed to give harsh sentences.

At any rate, the district court correctly held that *all acts* taken by Judge McCree directly involving King were judicial ones. *See King*, 2013 WL 3878739, at *4–5. As in *Stump* itself, both *Stump* factors point in the same direction. First, we consider "the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge." *Stump*, 435 U.S. at 362. Judge McCree's actions involved accepting a guilty plea, entering a delayed-sentence agreement, affording King apparent leniency in implementing a sentence agreement, placing King on a tether, and transferring King's case to another judge. These are functions undoubtedly "normally performed by a judge." *Stump*, 435 U.S. at 349. Second, we consider "the expectations of the parties, *i.e.*, whether they dealt with the judge in his official capacity." *Stump*, 435 at 362. King dealt with Judge McCree as the presiding judge in his felony child-support case. The interactions occurred in a courtroom and King's counsel was present, as were a lawyer for the state and a court reporter. The proceedings occurred on the record. They were also notated on the docket sheet. Because Judge McCree performed acts normally performed by judges and because he did so in his capacity as a state circuit court judge, his acts were "judicial." Accordingly, he receives judicial immunity.

On August 16, 2012, at the time of King's review hearing before Judge McCree, King was not in compliance with his delayed-sentence agreement. King was behind $672 on the agreement. Judge McCree noted that he could have sent King to "have a date across the street"—presumably to jail. Instead, Judge McCree allowed King to pay the money that was

16

owed by the end of the month. Additionally, Judge McCree placed a tether on King. Judge McCree may not have treated King differently from other similarly situated litigants. Assuming, arguendo, that Judge McCree's relationship with Mott motivated him on August 16 or that Judge McCree acted in bad faith on that date, the district court nonetheless correctly applied Supreme Court law: "A judge will not be deprived of immunity because the action he took . . . was done maliciously." *Stump*, 435 U.S. at 356; *see King*, 2013 WL 3878739, at *5; *see also Bright*, -- F.3d at --, 2014 WL 2457629, at *6 (recognizing judicial immunity even when a judge's actions "were petty, unethical, and unworthy of his office.").

2

On appeal, King argues that Judge McCree's non-judicial acts deprived him of due process. Specifically, King argues that he was "personally and directly deprived of [the constitutional guarantee of due process] every time Judge McCree and Mott engaged in any extrajudicial contact." Appellant Br. 21. King also argues: "Plaintiff's due process rights were violated when McCree and Mott had sex in chambers and elsewhere, when they spent time together outside the courtroom, discussed and decided how to sentence Plaintiff for his late child support payments." *Ibid.* Before the district court, King identified other allegedly non-judicial acts by Judge McCree that deprived him of due process, including: flirting with Mott from the bench on May 21, engaging in ex parte communications with Mott, giving Mott his business card, having lunch with Mott, "hav[ing] sex repeatedly" with Mott, having sex with Mott in his chambers, giving Mott $6,000, secretly discussing with Mott using jail to loosen King's "purse strings," and instructing Mott not to disclose the affair in order to avoid "deep shit."[7] Appellant

---

[7] We accept King's assertion that McCree's personal relationship with Mott consisted of non-judicial acts. *See Archie v. Lanier*, 95 F.3d 438, 444 (6th Cir. 1996) (Merritt, C.J., concurring) ("Yielding to an unruly libido is not the exercise of judicial power, or somehow like or related to

Br. 20 n.16. At oral argument, King's counsel argued that the depth and number of these non-judicial acts, as well as the intimacy of Judge McCree's personal relationship with Mott, makes this case exceptional. King's counsel described his theory as "death by a thousand cuts."

These acts, though often reprehensible, did not directly involve King. The district court correctly determined that these acts could not, without more on Judge McCree's part, deprive King of due process. *See King*, 2013 WL 3878739, at *4. "In the Sixth Circuit, a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort."[8] *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000). King can point to no case supporting his claim that Judge McCree's relationship with Mott, in itself, amounted to a constitutional tort against King. King relies on the following language from *In re Murchison*, 349 U.S. 133, 136 (1955): "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases." But this right extends to what occurs *in trials and tribunals*. This language suggests, at most, that Judge McCree's presiding over King's case violated King's due-process right—not that Judge McCree's non-judicial acts violated King's constitutional right. *Murchison* does not support King's claim that Judge McCree deprived King of due process every time Judge McCree engaged in extrajudicial contact with Mott. We hold that a defendant cannot avoid the bar of judicial immunity by relying on non-

---

the performance of judicial duties. . . . A judge's long study of the law does not proceed from sexual appetites, even though we may sometimes say that 'the law is a jealous mistress.'").

[8] To be sure, we made this statement in the context of discussing the identity of persons whose injuries may give rise to a § 1983 harm. *See Claybrook*, 199 F.3d at 357. King seeks to recover for injuries allegedly sustained only by him—not by other persons. But the underlying principle is similar: King must point to actions by McCree that directly deprived him of due process. King's argument, essentially, is that McCree's non-judicial acts affected McCree's judicial acts. But King cannot rely on this argument to escape the bar of judicial immunity.

18

judicial, out-of-court acts that may have affected in-court, judicial acts. Personal bias alone of a judge—when not serving in a judicial function— does not create a due-process violation.[9]

The district court held that even if King could proceed against Judge McCree under § 1983 for Judge McCree's non-judicial acts, King's claims would fail because Judge McCree was not "acting under color of state law." *King*, 2013 WL 3878739, at *4. On appeal, King argues that Judge McCree "acted under color of state law when he used his position as the presiding judge to satisfy his sexual desire." Appellant Br. 23. Because Judge McCree's non-judicial acts did not deprive King of due process, we need not decide whether Judge McCree was acting under color of law when engaging in his relationship with Mott. *See Stump*, 435 U.S. at 369 n.6 (dissenting opinion) (declining to decide whether judge was acting under color of state within the meaning of § 1983 when judge approved a petition relating to the affairs of a minor).

3

Although King does not discuss it, we are aware of the ongoing civil litigation against a former Pennsylvania state-court judge in which a district court held the former judge liable for his non-judicial acts that violated plaintiffs' civil rights. That case is substantially different. *See Wallace v. Powell*, Nos. 3:09-cv-286/0291/0357/0630/0357/2535, 3:10-cv-1405, 2014 WL 70092 (M.D. Pa. Jan. 9, 2014).

Mark Ciavarella, a former Pennsylvania juvenile-court judge, conspired with another judge and developers to construct and finance a new juvenile-detention facility and then to send juveniles to that facility, in exchange for kickbacks from the developers. *See id.* at *4–6. Between 2003 and 2007, while the conspiracy was ongoing, Ciaverella placed 217 to 330

---

[9] A due-process violation may, however, occur when the biased judge assumes the bench and presides over an actual case. *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases.").

juveniles in the new detention facility each year; between 2009 and 2011, after the conspiracy ended, the county juvenile court placed 31 to 38 juveniles in detention each year. *Id.* at *6. Ciavarella received over $2.7 million as part of his role in the conspiracy. *Ibid.* A federal grand jury indicted Ciavarella for racketeering, fraud, money laundering, extortion, bribery, and federal tax violations in connection with the conspiracy. *Id.* at *7. A federal judge sentenced Ciavarella to 28 years of imprisonment.

Multiple plaintiffs sought to hold Ciavarella civilly liable for violating their civil rights and for conspiracy to do so. *Id.* at *8. Even under these truly conscience-shocking, extraordinary circumstances, the district court recognized that Ciavarella received judicial immunity for his judicial acts—namely, finding the juveniles delinquent and sentencing them to the detention facility. *Id.* at *1. The district court said: "[B]ecause the law requires that judges no matter how corrupt . . . are immune from suit, former Judge Ciavarella will escape liability for the vast majority of his conduct in this action." *Ibid.*

The court, however, held Ciavarella liable for non-judicial acts that directly harmed the plaintiffs. *See id.* at *9–12. These acts included: appearing on television to urge the shutdown of an old county-run detention facility, aiding the new detention center in staffing the facility with employees of the old facility, enacting an administrative zero-tolerance policy that resulted in more juveniles receiving detention, persuading another judge to join the conspiracy, proposing the construction of the new facility, introducing two of the facility's developers, failing to disclose payments, and actively concealing payments. *Id.* at *9–10. Under a "setting in motion" theory of causation in which "[a] person 'subjects' another to the deprivation of a constitutional right . . . by setting in motion a series of acts *by others* which the actor knows or reasonably should know would cause *others* to inflict the constitutional injury," the court held that these

non-judicial acts directly caused the deprivation of plaintiffs' rights to an impartial tribunal. *Id.* at *11 (emphasis added).

As we see the case, Ciavarella's non-judicial acts not only "set in motion" the deprivation of the plaintiffs' rights but *directly* deprived the plaintiffs of their rights. Ciavarella was part of a scheme to deprive juveniles of their liberty who otherwise might not be so deprived.

## C

Judge McCree receives judicial immunity under existing Supreme Court law. We note, however, that whether judges *should* receive judicial immunity for all judicial acts is a question not free from doubt. In 1871, in *Bradley* itself, Justices Davis and Clifford dissented "from the rule laid down by the majority of the court, that a judge is exempt from liability in a case like the present, where it is alleged . . . that he acted maliciously and corruptly." *Bradley*, 80 U.S. at 357. In their view, judges who act maliciously should be "subject to suit the same as a private person would be under like circumstances." *Ibid.*

Additionally, in *Stump*, of the eight Justices to hear the case,[10] three dissented from the decision creating the Court's two-factor test to determine which acts are "judicial." *See Stump*, 435 U.S. at 364–69 (Stewart, Marshall, & Powell, JJ., dissenting). The dissenting Justices proposed an alternative test relying on the underlying rationale for judicial immunity. *See id.* at 368. They would have adopted a test that considered, in part, whether a judge's act occurred in the course of a case, whether litigants were present, whether the losing party could appeal, and whether there was even a pretext of principled decision-making. *See id.* at 368–69. For Justice Powell, the dispositive factor was whether a judge's act precluded "any possibility for the

---

[10] Justice Brennan did not sit. *See Stump*, 435 U.S. at 364.

21

vindication of [an individual's] rights elsewhere in the judicial system." *Id.* at 369 (Powell, J., dissenting separately).[11]

Nor has the Court spoken with a single voice in determining what qualifies as a judicial act even under the accepted *Stump* test. In *Mireles*, Justice Stevens dissented, arguing that a judge's ordering officers to commit a battery "has no relation to a function normally performed by a judge" and is, therefore, a non-judicial act. *Mireles*, 502 U.S. at 14. Justices Scalia and Thomas have also questioned whether the Court's "functional" approach to immunity questions has strayed significantly from the common-law foundation for absolute immunity as it existed in 1871, when § 1983 was enacted. *See Kalina v. Fletcher*, 522 U.S. 118, 131–35 (1997) (Scalia & Thomas, JJ., dissenting).

Our task on appeal, though, is limited to applying the law of the "one supreme Court." U.S. Const., art. III., § 1. The Supreme Court's judicial-immunity doctrine has remained undisturbed for decades. Under existing Supreme Court law, Judge McCree is immune from suit under the doctrine of judicial immunity.

IV

We AFFIRM the district-court judgment.

---

[11] McCree's acts would be "judicial" even under the tests proposed by both dissenting opinions in *Stump*.

22

**COLE, Circuit Judge, concurring.** What dark days for the Michigan court system, whose Hall of Justice is inscribed with the words "freedom," "truth," "equality," and perhaps most importantly—"justice." Through a deeply troubling pattern of personal and professional misconduct, as well as a long line of salacious news headlines that followed, Circuit Court Judge Wade McCree may as well have taken a sandblaster to those inscriptions. Casual readers of this opinion (as well as the plaintiff-appellant, Robert King) may erroneously conclude that, by affirming the grant of absolute judicial immunity from suit for personal damages, we are somehow endorsing Judge McCree's conduct or going out of our way to protect one of our own. Though constrained by precedent to grant immunity, we do nothing of the sort.

In this case, there is no debate that Judge McCree failed to meet even the most basic expectations for members of the judiciary. The Michigan Supreme Court recently determined that he had a sexual affair with Geniene La'Shay Mott, who was a complaining witness in a case before him; that he regularly engaged in ex parte communications with Mott regarding the status of the case, even while he was sitting on the bench, which led her to believe that she could influence his judicial decisions; that he asked Mott to keep their relationship confidential because of a then-pending Judicial Tenure Commission investigation regarding his previous conduct toward a female deputy sheriff; that he intentionally used his judicial position to advance his own interests by holding on to the *King* case to keep Mott interested in him; and that he failed to recuse himself from the case as soon as he started the relationship with Mott. *In re McCree*, 845 N.W.2d 458, 460–62 (Mich. 2014). As a result, the Michigan Supreme Court removed Judge McCree from office and conditionally suspended him without pay for six years beginning on January 1, 2015, on the off chance that Wayne County voters might re-elect him to office this fall. *Id.* at 476.

I applaud the Michigan Supreme Court for taking these actions and for doing its level best to restore some measure of dignity and integrity to the bench that Judge McCree so sullied. That said, King's suit seeking to hold Judge McCree personally liable for damages is not the solution. "Generally, we rely upon the judges further up the judicial hierarchy to review and correct the rulings of lower courts." *Bright v. Gallia Cnty., Ohio*, --- F.3d ---, Nos. 13-3451 & 13-3907, 2014 WL 2457629, at *1 (6th Cir. June 3, 2014). "Only in a few circumstances do we allow lawsuits against individual judges to proceed, and for good reason." *Id.* While Judge McCree's misconduct was worthy of removal from office, *see McCree*, 845 N.W.2d at 476, the majority opinion properly and persuasively concludes that his misconduct does not fit within one of the narrow exceptions to absolute judicial immunity.

Absolute judicial immunity remains "strong medicine." *Forrester v. White*, 484 U.S. 219, 230 (1988) (internal quotation marks omitted). At times, its application will seem over-inclusive—shielding from suits for damages those who clearly have abused their office and tarnished the reputation of the judiciary. This is the price we all must pay for "the benefit of the public, whose interest it is that judges should be at liberty to exercise their functions with independence and without fear of consequences." *Pierson v. Ray*, 386 U.S. 547, 554 (1967) (internal quotation marks omitted). I take solace knowing that the Michigan Supreme Court has already stepped in and rendered the best justice possible: removing Judge McCree from office. Accordingly, I join the majority in affirming the district court's grant of judicial immunity and dismissal of King's suit.